IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

RONALD ROSS,
        Petitioner,

vs.                                    Case No. 5:07cv219/RS/EMT

WALTER A. McNEIL,
        Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus, filed under 28 U.S.C. § 2254, and supporting memorandum (Docs. 1, 2). Respondent filed an answer to the petition with relevant portions of the state court record (Doc. 20). Petitioner filed a reply (Doc. 28). Upon review of the pleadings, the undersigned determined that Respondent's position as to the exhaustion requirement and procedural default defense was unclear as to four of Petitioner's claims (Grounds 3, 6, 7, and 9); therefore, the court directed Respondent to clarify his position (*see* Doc. 30). Respondent did so, clarifying that the State was not waiving exhaustion or any related procedural bars (Doc. 31). This case is now ready for disposition.

The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b). After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

## I.     BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are undisputed and established by the state court record (*see* Doc. 22).[1]  Petitioner was charged in the Circuit Court in and for Bay County, Florida, with second degree murder (Ex. A).  Following a jury trial on September 26–27, 2000, Petitioner was found guilty as charged (Ex. B at 386; Ex. C).  At Petitioner's sentencing hearing on October 4, 2000, the trial court adjudicated Petitioner guilty and sentenced him as a prison releasee reoffender to life imprisonment (Exs. D, E, F).

Petitioner appealed the judgment to the Florida First District Court of Appeal ("First DCA") (Exs. H, I, J).  On April 15, 2002, the First DCA affirmed the judgment of conviction per curiam without written opinion, with the mandate issuing May 1, 2002 (Ex. K).  Ross v. State, 814 So. 2d 1034 (Fla. 1st DCA 2002) (Table).  Petitioner did not seek certiorari review by the Florida Supreme Court or the United States Supreme Court.

On February 27, 2003, Petitioner filed a petition for writ of habeas corpus with the First DCA alleging ineffective assistance of appellate counsel (Ex. M).  On March 31, 2003, the First DCA denied the petition per curiam without written opinion (*id.*).  Ross v. State, 982 So. 2d 1181 (Fla. 1st DCA 2003) (Table).

Also on February 27, 2003, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. L).  The trial court denied the motion in part and set the remaining grounds for an evidentiary hearing (Ex. O).  Following the evidentiary hearing, at which Petitioner was represented by counsel, the court denied the remaining grounds in an order rendered January 13, 2005 (Exs. P, Q, S).  Petitioner appealed the decision to the First DCA (Ex. T).  Petitioner's counsel filed a brief asserting she was unable to make a good faith argument that reversible error occurred in the trial court (Ex. U).  Petitioner filed a pro se brief in which he argued error in the court's disposition of four of his claims (two of which were the subject of the evidentiary hearing and two of which were not) (Ex. V).  On July 10, 2006, the First DCA affirmed

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (Doc. 22).

the decision per curiam without written opinion, with the mandate issuing August 28, 2006 (Ex. W). Ross v. State, 935 So. 2d 505 (Fla. 1st DCA 2006) (Table).

On November 21, 2006, Petitioner filed a motion to correct illegal sentence, pursuant to Rule 3.800(a) of the Florida Rules of Criminal Procedure (Ex. Y). The state court summarily denied the motion in an order rendered December 1, 2006 (Ex. Z). Petitioner appealed the judgment to the First DCA (Exs. BB, CC). On May 29, 2007, the First DCA affirmed the decision per curiam without written opinion, with the mandate issuing July 30, 2007 (Ex. DD). Ross v. State, 959 So. 2d 722 (Fla. 1st DCA 2007) (Table).

Petitioner filed the instant habeas action on September 14, 2007 (Doc. 1 at 1). Respondent concedes that the petition was timely filed (Doc. 20 at 7).

II.     TRIAL EVIDENCE

Review of the evidence adduced at Petitioner's trial provides a helpful context in considering his claims. The victim in this case was Caesar Pacheco. The State's first witness was Jessica Lichaczewski, the mother of one of Mr. Pacheco's children (Ex. B at 29). She testified that Mr. Pacheco was originally from Guatemala and spoke English with an accent, such that if a person were unaccustomed to conversing with him, he may be difficult to understand (id. at 30, 32). She also testified that Mr. Pacheco had been living in the Bay County area for only a few months prior to his death, and he was not familiar with the area (id. at 31, 32). Ms. Lichaczewski testified that Mr. Pacheco drank alcohol on weekends with friends, but he did not drink heavily on a regular basis (id. at 33). She testified that he owned several wrist watches, including one with a glowing face (id.).

James Depner testified that Mr. Pacheco worked for him in his construction business for approximately three months (id. at 36–37). He testified that Mr. Pacheco understood English "quite well," but to someone who did not know him, it would be difficult to understand him due to his accent (id. at 37).

Alto McKinney testified that on the night of March 31, 2000, at approximately 10:00 p.m., he and Mr. Pacheco took a taxi to Stetsun's, a bar where Mr. McKinney went every Friday night (id. at 40–42). Mr. McKinney saw Mr Pacheco order a beer at the bar, and the next time he saw him, Pacheco was standing outside the bar (id. at 43). Mr. Pacheco told Mr. McKinney that he had been

told to leave the bar because he was "feeling on a lady's butt," but Pacheco denied that he did it (*id.*). Mr. McKinney called a taxi for Mr. Pacheco, and the two planned to meet later at Bambi's (*id.* at 43–44).

The taxi driver, Richard Castiglone, testified that he picked up Mr. Pacheco at Stetsun's at approximately 2:00 a.m. on April 1 (*id.* at 48–49). Pacheco told him that he wanted to go to the nearest topless bar, so he drove Pacheco to Bambi's Dollhouse (*id.* at 49). Mr. Castiglone testified that Mr. Pacheco appeared to have had "a few drinks," but "appeared very sober" and was not falling or slurring his words (*id.*). He testified Mr. Pacheco did not speak English well (*id.* at 50). Mr. Castiglone testified that approximately forty-five (45) minutes later, he saw Mr. Pacheco in front of a store in Callaway (*id.*). Mr. Pacheco asked him to take him another topless bar, so Castiglone drove him to Tan Fannies near the St. Andrews Marina (*id.* at 50, 53). Mr. Castiglone testified that Mr. Pacheco's degree of intoxication appeared the same (*id.* at 50). He also testified that Mr. Pacheco did not appear to be familiar with the area (*id.* at 53–54).

Sonya Weir, a dancer at Tan Fannies, testified that at approximately 2:00 a.m. on April 1, Mr. Pacheco came into the bar with Petitioner (*id.* at 54–57). She testified that the two men drank together and then left (*id.*). Ms. Weir testified that Petitioner returned to the bar alone approximately an hour later to look for his wallet, and he told her that he wanted to take her home (*id.* at 57–58). She testified that Mr. Pacheco appeared sober (*id.* at 59). She stated that Petitioner was not drunk when he left the bar the first time, and he appeared sober when he returned (*id.* at 58–59). Ms. Weir testified that Mr. Pacheco barely spoke English and had approximately $200.00 (*id.* at 60).

Shawn Trench, the manager of Tan Fannies, testified that there is a video surveillance system at the bar (*id.* at 63–64). He testified that Petitioner came to the bar at 1:00–1:30 a.m. on April 1 and stayed until closing (*id.* at 65–66). He testified that while Petitioner was there, Petitioner dropped his wallet and the two of them looked for it and found it (*id.* at 66). Mr. Trench testified that the wallet contained four or five hundred dollar bills (*id.*). He testified that Petitioner drank a few beers over the three-hour period he was at the bar (*id.* at 67). Mr. Trench testified that Mr. Pacheco came to the bar at approximately 3:00 a.m. and drank one or two beers (*id.* at 68–69). He testified that approximately 15–20 minutes prior to closing at 4:00 a.m., Petitioner and Mr. Pacheco began talking

(*id.* at 69). He stated that the two men left at approximately the same time, and Petitioner returned to retrieve his keys and then left again (*id.* at 69–70). Mr. Trench testified that Petitioner was not highly intoxicated and did not slur his speech or walk abnormally (*id.* at 70–71). He testified Mr. Pacheco "had a little buzz on" but did not appear to be drunk (*id.* at 71). He also testified that Mr. Pacheco spoke with an accent and was difficult to understand (*id.* at 71–72). Mr. Trench identified a videotape that he gave to the sheriff's office (*id.* at 72). He testified that he viewed the videotape prior to testifying in court, and it accurately reflected the events at Tan Fannies from 1:51–4:00 a.m. in the early morning hours of April 1, 2000 (*id.*). The prosecutor, with defense counsel's consent, published portions of the video to the jury, with Mr. Trench narrating (*id.* at 73–78). The video showed Mr. Pacheco enter the bar at approximately 2:54 a.m. (*id.* at 75–76). Mr. Trench testified that after Mr. Pacheco and Petitioner left the bar, he did not see them again (*id.* at 78). On cross-examination, Mr. Trench testified that generally when a patron finishes a beverage, the bartender will ask if he wants another (*id.* at 79). He testified that Petitioner was drinking beer the entire three-hour period he was at the bar that night but did not seem "out of control" (*id.* at 79–81). Mr. Trench also testified that patrons did not often lose their wallets or keys in the bar, but Petitioner lost both that evening (*id.* at 79–80).

Jordan Kaiser testified that he worked at the BP Bee Line and finished his shift at 7:30 a.m. on the morning of April 1, 2000 (*id.* at 82). He testified that at approximately 8:30 a.m. he parked in the parking lot of the Deer Point Park Dam to eat a snack, with his car facing the water (*id.* at 82–83, 86). No other cars or people were in the parking lot (*id.* at 83). As he sat there, a woman appeared and summoned him to the water (*id.*). He went to the water and saw a body floating face down (*id.* at 83–84). Mr. Kaiser testified that the body was clothed with a shirt and jeans, but the jeans were pulled down (*id.* at 84). He called the police and waited approximately twenty minutes for them to arrive (*id.* at 84–85, 88).

John Corley, an investigator with the Bay County Sheriff's Department, testified that he arrived at the scene at approximately 11:45 a.m. to identify and collect physical evidence (*id.* at 91–92). He testified that the body was positioned in the water approximately twenty-three feet, six inches from the seawall (*id.* at 92–93, 107–08). Corley testified that blood was found in the parking

lot, on part of a wooden trash can container, on a wooden post, on the edge of a concrete curb, and in three areas in the grass (*id.* at 92–94). Regarding the blood in the parking lot, he stated that there were several spots of blood in a two-foot area of the parking lot (*id.* at 119). With regard to the concrete curb, he stated that there appeared to be a bloody hand print from a left hand on the edge of the curb, and the fingers were facing the road instead of the water, so it appeared that someone was gripping the curb for leverage (*id.* at 120). Corley testified that there was blood on both sides of the wooden post (*id.* at 121). He also stated that there was a blood stain on the grass approximately 2–3 feet in diameter, and it appeared to be spread around as if someone rolled around in it (*id.*). He testified that there was an area of blood approximately 17 feet from the seawall, which seemed the heaviest concentration as it had seeped down into the grass (*id.* at 122). Corley testified that near the seawall, the grass was "pushed down" and "if you looked real close you could see where it was pushed down in a direction towards the water" (*id.* at 94). Corley noted that there were two or three small black hairs on the edge of the wooden seawall, and some of the dirt near the seawall was disturbed or "pushed up" (*id.* at 98). He also observed a Seiko watch with a broken band on the ground in the grassy area of the park between the water and the parking lot (*id.* at 92–93). He testified that they recovered a wallet from the water, which contained a resident alien identification card of Caesar Pacheco and $4.00 in currency (*id.* at 128). Investigator Corley identified many of the State's exhibits, including several photographs (*id.* at 97–107). He identified photographs of Mr. Pacheco's body, which depicted blue jeans and black shorts underneath the jeans, both of which were pulled down to his ankles, and green underwear pulled down between his buttocks and knees (*id.* at 108). He testified he did not believe that the current of the water could have pulled the jeans down to that position (*id.* at 127–28). Corley testified that the body was bent at the knees and floating face down (*id.* at 129). He stated that $19.00 in currency was recovered from the body (*id.* at 128).

Corley testified that later that evening, he was contacted by Sergeant Willoughby, who told him he had taken Petitioner to the Sheriff's Department and was delivering Petitioner's car to Corley (*id.* at 110). Investigator Corley identified photographs taken of Petitioner in the interview room of the Sheriff's Department, which showed a small scrape or gouge mark on Petitioner's nose, a

bandage on one finger of his right hand, and "some injuries to his pinky finger" (*id.* at 110–111). Using a close-up photograph, Corley described a "fairly deep" injury to the middle finger of Petitioner's right hand, in addition to other scrapes, and an injury on the first knuckle of the pinky finger (*id.* at 112). Investigator Corley also identified photographs taken of Mr. Pacheco's body. He described the photographs as showing injuries to Mr. Pacheco's mouth, swollen eyes, a laceration over one eye, and bruising and abrasions on his arms, chest, and shoulder (*id.* at 114–16). Additionally, Investigator Corley identified pictures taken of Petitioner's car, a black Camaro (*id.* at 116). He described a photograph of the exterior of the passenger side door and noted that there were marks indicating that an area of the door had been wiped with a rag or type of cloth (*id.*). He also noted small spatters of blood on the inside of the passenger side door panel and door frame (*id.* at 117). He testified that the blood spatter indicated that the blood traveled in a forward direction, toward the front of the car and at a downward angle (*id.* at 117–18). Corley testified that it was possible that the disturbed area of ground near the seawall had a drag mark because the dirt was pushed towards the seawall, and hair was found on the edge of the seawall (*id.* at 122–23). Investigator Corley testified that he sent fingerprints taken from Petitioner's black Camaro to a crime lab, but they could not be identified as belonging to Petitioner or Mr. Pacheco (*id.* at 123). He also sent tire impressions that were recovered from the parking lot, but they did not match the tires of the Camaro (*id.* at 123–24).

The State's next witness was Dr. Marie Hermann, the medical examiner. She testified using photographs of Mr. Pacheco's autopsy and described the injuries she found on his body (*id.* at 134–38). She observed a laceration on the left side of the lower lip which extended through to the inside of the lip (*id.* at 134). She also observed a small, superficial laceration on the bridge of his nose and fractures of the nasal bones (*id.*). She stated that both of the periorbital areas had contusions or blood seeping into the subcutaneous tissues, and there were superficial lacerations on the right eye lid and the left side of the orbit region (*id.*). She also observed a laceration on his right cheek (*id.* at 134–35). She testified that Mr. Pacheco had multiple small, round bruises on his right forearm and hand, but there did not appear to be any injuries over the knuckle areas of his hands (*id.* at 135). She testified that on the outside area of his left arm there was a rectangular abrasion that

was surrounded by a bruise and some small blue, purply contusions, which were characteristic of blunt force trauma, either something striking the skin or the body striking something as it is falling (*id.*). Dr. Hermann testified that the bruises on Mr. Pacheco's face were caused by blunt force trauma, either something striking his face or his face striking something (*id.* at 136). Mr. Pacheco had a rectangular bruise on the left side of his chest, a few linear bruises on the right side of his chest, and bruising on the front of one of his shoulders (*id.* at 136–37). He also had two broken ribs (*id.* at 137).

In addition to the injuries depicted in the photographs, Dr. Hermann observed hemorrhages into the whites of Mr. Pacheco's eyes (*id.* at 138). Between the scalp and the bone there were areas of bleeding on the right side of his forehead, the right side of his face, and over the top of his head, with more injury on the left side of the scalp (*id.*). She testified that a scalp hemorrhage is not usually lethal, but it indicates there was blunt force trauma applied to the skin (*id.* at 139). She stated that even though there was only a small amount of blood that had leaked beneath the skull bone and over the surface of the brain, the passage of time from when the blunt force trauma occurred can cause death because pressure on the brain increases and blood travels to the base of the brain, which compresses the area responsible for respiration and heart rate (*id.* at 140–41). Dr. Hermann testified that the injuries to Mr. Pacheco's head could have caused him to become unconscious (*id.* at 142). She also testified that the fracture to his nose may have affected his ability to breath if the blood entered his airway, but she observed only a small amount of blood in his airway (*id.* at 143, 145). She observed that blood had leaked from the vessels of his neck into the muscles, indicating that pressure had been applied to the back of his neck, perhaps from being grabbed by the back of the neck (*id.* at 138–39).

Dr. Hermann testified that she also examined Mr. Pacheco's anal rectal region and observed a surface tear of the skin and mucosa at the "12:00" position or top, accompanied by some blue discoloration or bruising (*id.* at 143–44). She also observed some blue discoloration or bruising on the right and left sides of his anal canal (*id.* at 144). She testified that Mr. Pacheco was 5 feet, 6 inches tall and weighed 156 pounds (*id.*).

Dr. Hermann testified that she did not observe any water or other fluid in Mr. Pacheco's lungs (*id.* at 145). When asked about the diagnosis of drowning, Dr. Hermann testified as follows:

> A.     The diagnosis of drowning is made most often by inference or by witness, witnessed events. There may be, when someone drowns they may drown by taking water into their airway and that would, of course, result in the lungs having extra fluid or water in them. Many times or when a body is found in the water and has been in the water for a prolonged period of time there will be excess fluid in the airways and in the lungs. Many times when there is a witnessed drowning in an otherwise healthy person at autopsy there is air in the lungs and not a lot of fluid but there is no other explanation for the death other than drowning. Drowning is a diagnosis of circumstances and there are no good reliable criteria to say by looking at the body alone that the person drowned. It is based on circumstances and the fact that someone is in or near water.
>
> Q.     If a person, this victim, were either unconscious and he was placed or somehow became in the water would that be consistent with there not being a lot of water in the lungs?
>
> A.     Yes.
>
> Q.     And if that person were dead at the time that he was, somehow got in the water, would that also be consistent that there would be no water in the lungs?
>
> A.     Yes.

(*id.* at 146–47).

Dr. Hermann testified that Mr. Pacheco's death could have occurred "anywhere from 2 hours to 6 hours to 8 hours to 24 hours" before his body was found (*id.* at 148). She also testified that his blood alcohol level was 0.21 grams per deciliter, which "absolutely" would have affected his ability to move or be as physically sharp as if he were sober (*id.* at 148–49). With regard to Petitioner's injuries, Dr. Hermann examined one of the photographs of Petitioner's hand and testified that the type of injury may be consistent with his hitting someone (*id.* at 149). She stated that her opinion as to the cause of Mr. Pacheco's death was homicidal violence including blunt force head trauma and drowning (*id.* at 150).

On cross-examination, Dr. Hermann testified that the blood alcohol level of 0.21 grams per deciliter was medically significant, in light of the fact that 0.08 grams per deciliter was the level at

which a person was considered legally intoxicated to the extent that he should not drive, and because that is the level at which "everybody is affected in their abilities to react and make judgments, perception, visual perception, . . . social interaction." (*id.* at 151). She explained that generally, a blood alcohol level of 0.08 in a 150–170-pound person is the result of approximately three or four standard-sized drinks in one hour; so a blood alcohol level of 0.20 would indicate that a person consumed eight to ten drinks in one hour, and at that level, a person is "certainly impaired" in their motor functioning and sensory perception (*id.* at 151–52). She testified that the injuries to Mr. Pacheco's head could have affected his ability to walk and talk notwithstanding his alcohol consumption (*id.* at 153).

Dr. Hermann repeated her previous testimony that the amount of blood between Mr. Pacheco's skull and brain probably did not, by itself, cause his death (*id.* at 154). She also testified she could not state with certainty which head injury caused the bleeding on Mr. Pacheco's brain (*id.*). She testified that a punch to the nose, a punch in the eye, or falling down and hitting his head could have led to the type of bleeding she observed in Mr. Pacheco (*id.* at 154–55). Dr. Hermann testified that she would not necessarily find water in the lungs of a person who was "alive and conscious" when he entered the water and then drowned either because his head was held under or because he fell into the water face down (*id.* at 160). She testified that one explanation for "dry drownings" is an automatic reflex called a "laryngeal spasm," in which the airway closes off and prevents water from getting into the lower portion of the respiratory system (*id.* at 160–61). She testified that even when she knows that a person drowned, she sometimes finds water in the lungs and sometimes does not (*id.* at 161). Defense counsel then asked Dr. Hermann a number of questions apparently for the purpose of summing up her testimony regarding her findings as to the cause of Mr. Pacheco's death:

> Q. So just so everybody understands, this Caesar Pacheco could have been alive when he entered the water and drowned or he could have been dead when he entered the water and assumed that position. Either one of those scenarios could be correct?
>
> A. That's correct.

> Q.     And he could have died from drowning, from being face down in the water not being able to breathe?  That is certainly a way he could have died, correct?
>
> A.     That's correct.
>
> Q.     He could have died from blood collecting from the broken nose running down into his air passage, blocking his ability to breathe?  That is a possible modality of death?
>
> A.     That wouldn't be my opinion in this particular case.  There did not appear to be enough collection of blood in the airway to have caused asphyxial death due to airway obstruction by blood.
>
> Q.     A blow to the face could have caused his death?
>
> A.     Yes.
>
> Q.     The bleeding on the brain, although it didn't appear to be that much, could possibly have caused death, although it is not likely?
>
> A.     That's an indication that a significant injury occurred to the head sufficient enough to cause the bleeding would be sufficient enough to cause the death.
>
> Q.     So that is, if he died and there wasn't anything else that you saw and there was that amount of blood in the brain that would be your opinion that that's what caused his death, blunt force head trauma?
>
> A.     That's correct.

(*id.* at 163–64).  Dr. Hermann testified that the combination of alcohol intoxication and emersion in cold water may make the heart susceptible to arrhythmia, but cardiac arrhythmia is not detectable from an autopsy (*id.* at 165–66).

Doug Haddix, an investigator with the Bay County Sheriff's Department, testified that at approximately 9:00 p.m. on April 1, 2000, he asked Petitioner to accompany him to the Sheriff's Department (*id.* at 170–71).  He testified that after they arrived at the Sheriff's Department, he advised Petitioner of his <u>Miranda</u> rights, and Petitioner agreed to make a recorded statement (*id.* at 171–72).  Without objection from defense counsel, the prosecutor published the recorded statement and a transcript thereof to the jury (*id.* at 174–80).  In the recorded statement, Petitioner said he got

off work at 4:30 p.m. on March 31, and at approximately 6:00 he and a friend named Kelly went to the Toy Box, a dance club, and drank approximately six beers (*id.* at 176–77). Petitioner stated he became intoxicated, so he slept in his car, a black Camaro (*id.* at 178). He stated that his car was parked at the rear of the Toy Box when he was asleep (*id.* at 178–79). Petitioner stated that he awoke at 12:30 a.m. the morning of April 1 and drove straight home (*id.*). Investigator Haddix testified that he showed Mr. Pacheco's identification card to Petitioner and asked him if he had ever seen him before, and Petitioner stated no (*id.* at 179–80).

Connie Hester, Petitioner's mother, testified that on April 1, Petitioner came to her house and asked her to bandage an injury on his hand (*id.* at 181). She asked him how he obtained the injury, and Petitioner told her he hurt his hand at work (*id.* at 181–82). Mrs. Hester noticed a small cut on the bridge of Petitioner's nose and asked him how it happened, and he responded that a window fell and hit his nose at work (*id.* at 182). Eugene Hester, Petitioner's stepfather, gave the same testimony regarding Petitioner's explanation of his injuries that day (*id.* at 183–84).

Stacy Ross, Petitioner's sister, testified that Petitioner, who lived with her at the time, borrowed her black Camaro on March 31 to go to work, and the next time she saw him was 7:00 p.m. the next day (*id.* at 184–85). She testified the driver's side door of the car was difficult to open, and a person had to reach inside the door panel to pull the door latch (*id.* at 185). She stated that when she saw Petitioner the evening of April 1, he had a bandage on his finger and a small cut on his nose (*id.* at 186). She asked him how he was injured, and he told her he had been injured at work (*id.*). On cross-examination, Ms. Ross testified that she lives approximately five minutes away from the Deer Point Lake (*id.* at 187). She stated that a person going to her house would leave the park, cross the dam, and take the first right turn onto Resota Beach (*id.* at 187–88). She testified that when she awoke the morning of April 1, Petitioner was asleep on the couch (*id.* at 189). She stated that she took the black Camaro to work and was gone all day (*id.* at 188–89). She testified that after the police took Petitioner to the Sheriff's Department that night, they returned to her home and searched it (*id.* at 189–90). She stated she never saw any wet clothing or shoes of her brother's, and the police did not find anything of that nature during their search (*id.* at 190). She also testified that the car looked normal that day, and she did not observe any wetness or blood (*id.* at 191).

Ann Talkington testified that she took her three children to the park at Deer Point Dam Road on April 1, sometime before 9:00 a.m. (*id.* at 198–99). She testified that she was pushing her children in a stroller as they walked around the lake, and as the children were getting out of the stroller, she saw a dead body floating face down in the water (*id.*). She gathered her children and approached a man sitting in his car in the parking lot and told him they needed to call the sheriff because there was a dead body in the water (*id.* at 200–01). Ms. Talkington testified that she and the children had been near the seawall when they were walking earlier, and she was standing on the seawall when she first saw the body (*id.* at 202–03).

Jack Remus, an expert in the field of forensic serology and DNA examination, testified that there were "at least two specific sources" of the blood he tested from some of the State's exhibits. He testified that there was a high degree of probability that the most potential source for the blood found on the door of the black Camaro and the wooden post in the park was Petitioner (*id.* at 218–19, 221–22, 223). He testified that there was a high degree of probability that the most potential source for the blood found in the parking lot and on the concrete curb was Caesar Pacheco (*id.* at 220–21, 223).

The prosecutor recalled Investigator Corley. He testified that when he searched the black Camaro, he found a shirt in the passenger seat and a leather jacket and other clothing items in the back seat (*id.* at 226–27). He testified that he discovered clothing in the trunk that was wet and mildewed "like it had been in there awhile" (*id.* at 227). The prosecutor asked him more specific questions concerning distances between certain items found at the crime scene. Corley testified that Mr. Pacheco's body was in the water 23 feet, 6 inches from the seawall, and the area where the dirt was disturbed was near the seawall (*id.* at 227–28). He stated that the grassy area where he found the most blood was 17 feet, 7 inches from the seawall (*id.* at 228). He also found blood in the grass 22 feet, 4 inches from the seawall and 32 feet, 2 inches from the seawall (*id.*). He testified that a purple comb was located 49 feet, 5 inches from the seawall, and the Seiko watch was located 51 feet, 11 inches from the seawall (*id.* at 228–29). Investigator Corley testified that the wooden post on which he discovered blood (which Mr. Remus testified was probably Petitioner's) was at the edge of the concrete (*id.* at 229). He testified that the bloody hand print on the concrete curb was

approximately 4–6 feet from the blood spot in the parking lot (Mr. Remus testified that the blood from both of these area was probably Mr. Pacheco's) (*id.*).

The State rested its case (*id.* at 230). The judge asked to speak with counsel at sidebar, but the conference was not reported (*id.* at 231).

The defense called Greg Robinson as its first witness. Mr. Robinson testified that he was working as a bouncer at Stetsun's on March 31, 2000 (*id.* at 231). Mr. Robinson testified that he remembered seeing Mr. Pacheco that night (*id.* at 233). He stated several female customers complained about Mr. Pacheco grabbing them on their backsides, so he asked Mr. Pacheco to stop, and he agreed (*id.* at 233–34). Mr. Robinson testified that several females continued to complain about the same behavior, so he asked Mr. Pacheco to leave the bar, and Mr. Pacheco left (*id.* at 234). He testified that Mr. Pacheco did not appear to be very intoxicated (*id.* at 236).

The defense then called Investigator Corley. Corley testified that it appeared to him that a fight or struggle occurred in the parking lot, and blood was shed (*id.* at 238–39). He stated he was able to follow a trail of blood from the parking lot to the seawall (*id.* at 239). Corley testified that the blood spatters on the door sill of the black Camaro indicated "cast off staining," which he described as occurring when a bloody object is moved in a direction and with force and then stopped, such that particles of blood cast off from the object and appear on whatever object is present in front of it or in the direction of the force (*id.* at 241). He testified, consistent with his previous testimony, that the blood appeared to be directed in a forward and downward direction on the car door (*id.*). Investigator Corley further testified that blood on the main frame of the car indicated that the door was open at the time that blood was deposited there; and there was blood on the inside of the car door that was deposited there while the car door was open (*id.* at 242–43). Corley testified that the area where it appeared someone had lain for several minutes was approximately seventeen (17) feet from the seawall, where a body could be deposited in the water (*id.* at 246–47). He admitted that this area (where it appeared someone had lain for several minutes) was a closer and more direct route to the water that the area of disturbed ground where he previously testified Mr. Pacheco could have entered the water; however, the distance between the two areas was only approximately 6 feet, 5 inches (*id.* at 247–48, 260). Corley was shown the "slip-on loafers"

that he found on Mr. Pacheco's body (*id.* at 254). He admitted that the shoes would likely have been pulled off Mr. Pacheco's feet if he had been dragged by his head with his feet "dangling" (*id.* at 254–55). Corley also admitted that the black hairs found on the seawall were not tested to determine whether they were from an animal or human, but he explained that the crime laboratory does not conduct hair comparisons for the presence of DNA unless the root of the hair is present (*id.* at 258–59, 262). On cross-examination by the prosecutor, Corley testified that Petitioner was taller and bigger than Mr. Pacheco (*id.* at 263).

Mr. Kelly Widmar testified that he and Petitioner went to the Toy Box at approximately 4:00 p.m. on March 31, 2000 (*id.* at 264–65). He testified that at 8:00 or 9:00 p.m., he and Petitioner began to leave, but Petitioner could not find his car keys (*id.* at 266). Widmar went back into the bar, and when he came out, Petitioner was asleep in the black Camaro (*id.*). Widmar testified that he tried to wake Petitioner, but was unable to, so he called another friend for a ride home (*id.*). Mr. Widmar testified that he and Petitioner were tired that night (*id.* at 266–67). When asked whether Petitioner had a lot to drink, Widmar stated, "No, sure didn't, about maybe five or six beers" (*id.* at 267).

Defense counsel then called Petitioner to the stand (*id.* at 268). Petitioner testified that on March 31, 2000, he was employed as a carpenter (*id.* at 269). He stated that day was a payday, and he finished work at approximately 4:00 p.m. (*id.*). He and his friend Kelly went to the Toy Box, a topless bar, and drank beer and tipped the dancers (*id.* at 270). He remembered that he and Kelly eventually left the Toy Box, and he (Petitioner) passed out in his car because he was very intoxicated (*id.* at 271). Petitioner testified that when he awoke, he walked back into the Toy Box, bought another beer, and looked for Kelly but could not find him (*id.* at 271–72). Petitioner testified he was not sober at that point, but he was able to walk and talk (*id.* at 272). He testified that he believed he was an alcoholic (*id.* at 272–73). He testified he left the Toy Box and drove to Tan Fannies (*id.* at 273). He stated he did not have any trouble driving (*id.*). At Tan Fannies, he bought a beer and turned around to tip Sonya Weir, one of the dancers, when he discovered his wallet was gone (*id.*). He was initially upset because he had been paid $540.00 in cash that day, but then Mr. Trench found the wallet, so he was not upset (*id.* at 270, 274–75). Petitioner stated he drank constantly from the

time he walked into the bar until the time he left (*id.* at 274).  Petitioner recalled speaking to a foreign person, who Petitioner believed was Vietnamese and later learned was Mr. Pacheco, near closing time at 4:00 a.m. (*id.* at 275).  Petitioner testified that by that time, he and Mr. Pacheco were the only patrons in the bar, and the only other persons were Mr. Trench, the bartender, and the dancer (*id.* at 276).

Mr. Pacheco told Petitioner he was a fisherman or shrimper, and Petitioner asked him if he needed a ride to his boat (*id.* at 276–77).  Petitioner testified that he was intoxicated at that point, and should not have been driving his car (*id.* at 277).  After the two were in Petitioner's car, Petitioner asked Mr. Pacheco where he lived, and Pacheco responded "marina" (*id.* at 278).  Petitioner went to the St. Andrews Marina behind Tan Fannies, but when they arrived, Mr. Pacheco said that his fishing boat was out (that is what Petitioner interpreted him to say) (*id.*).  Petitioner asked Mr. Pacheco where he lived, and Pacheco responded, "Callaway," so Petitioner took Highway 98 through town in the direction of Callaway (*id.* at 278–79).  Once in Callaway, Mr. Pacheco was not familiar with the area and could not direct Petitioner to where he lived (*id.* at 279).  Defense counsel asked Petitioner why he did not just drop him off, and Petitioner responded that since he offered Pacheco a ride home, it would have been rude to drop him off in an unfamiliar area (*id.*).  Petitioner kept driving and noticed that a police car pulled up to a nearby convenience store, so Petitioner turned off the highway to avoid the officer, since Petitioner was intoxicated (*id.* at 280).  Petitioner turned onto Highway 231 and decided to go home, near Dear Point Lake (*id.* at 280–81).  He turned onto the "dam road" and began feeling sick, so he pulled off the road into the parking area of Deer Point (*id.* at 282).  He exited the car because he did not want to vomit in the car (*id.*).  Petitioner testified that he grabbed a garbage can and vomited into the can, and then he passed out face down (*id.* at 282–83).  He did not know how long he was asleep, but when he awoke, there was a man on top of him (*id.* at 283).  Petitioner did not know if the man was the same man who was in the car, and he did not know how he or the other man was clothed at that point (*id.* at 283–84).  Petitioner recalled struggling to his feet, then falling to the ground, then starting to get back up, and at that point a fight ensued (*id.* at 284).  Petitioner remembered fighting the man, but he did not remember if his pants were up or down, or if the other man's pants were up or down (*id.*).  Petitioner

did not remember how long the fight lasted, but he remembered that it ended when he got back into his car while the other man was on the grass (*id.* at 284–85). Petitioner recalled that when he started to drive off, the passenger door "opened up as if it wasn't latched," and when he accelerated, the door closed (*id.* at 285). Petitioner drove to his sister's house, where he was living at the time, and at that point knew he had beaten a man, but he assumed the man was alive (*id.*). He stated he left the man "knocked out" on the ground (*id.* at 286).

Petitioner testified that when he arrived at his sister's house, he stepped out of the car and realized that his shorts were down around his left ankle (*id.*). He testified that neither his shorts nor his shoes were wet (*id.*). He entered the house and went to sleep on the couch without speaking to anyone (*id.* at 286–87). Petitioner admitted that he probably had quite a bit of blood on him, but he did not take a shower because he did not want to wake his sister (*id.* at 311). He testified that when he heard his sister leave for work, he got up and took a shower, placing his clothes in a hamper in the bathroom (*id.* at 287). Petitioner testified that his hands hurt, and although they were not bleeding, there was "body fluid, white water running from it" (*id.* at 287–88). Petitioner asked his mother to bandage his hand, and when she asked what happened, he told her a window hit him at work (*id.* at 288). When defense counsel asked Petitioner why he did not tell her what happened, he responded, "I would never tell my mama nothing" (*id.*). When asked why he did not tell the police what happened, Petitioner responded, "How do you tell anybody what happened. I could not tell the police officer and I wouldn't be telling no one now." (*id.*). Petitioner stated he did not know whether or not he had been raped that night. Petitioner testified that he did not pull Mr. Pacheco's pants down or put him in the lake; but he admitted he fought with him and beat him (*id.* at 288–89). Petitioner reiterated that he believed that Mr. Pacheco was still alive when he (Petitioner) left the park (*id.* at 289).

On cross-examination, Petitioner admitted that he had previously been convicted of three felonies (*id.*). The prosecutor questioned Petitioner again about the amount of alcohol he drank that night, and Petitioner testified that during the eight-hour period from 5:00 p.m. to 1:00 a.m., he drank five beers and one shot, and from 1:00 a.m. to 4:00 a.m., he drank four or five beers (*id.* at 293–94). He testified that he was able to drive from the Toy Box to Tan Fannies without any problem (*id.* at

295). Petitioner testified that he had no problems driving when he left Tan Fannies, but when he turned down the "dam road," he began to feel sick (*id.* at 303–05). Petitioner admitted that Mr. Pacheco did not initiate conversation with him at Tan Fannies, instead, he (Petitioner) initiated their conversation (*id.* at 297). The prosecutor asked Petitioner whether Mr. Pacheco was argumentative in the car, and Petitioner responded that the two of them spoke very little while they were in the car because they could only understand one-word sentences from each other (*id.* at 302–03).

When the prosecutor questioned Petitioner about his realization that someone was on top of him in the park, Petitioner testified that when he felt someone on top of him, he got up off the ground, struggled and fell forward, got back up, and then realized that his clothes were off and the man's clothes were off, and that is when they started fighting (*id.* at 306). With regard to Petitioner's injuries to his face, he testified that he had a cut on his nose and two black eyes (*id.*). Petitioner testified that he remembered hitting Mr. Pacheco in the head with his fist, and he admitted he probably fractured Mr. Pacheco's nose and ribs when he punched him (*id.* at 307–08). Petitioner testified as follows:

> A.  . . . he had me in a head lock and I was punching him inside. And we fell forward and I got back up and he got back up and we fought again. I got him down on the ground and just started punching again and I had him down.
>
> Q.  You just kept punching him until he was unconscious, right?
>
> A.  Yes, ma'am.
>
> Q.  So you just kept going until he no longer was conscious; right?
>
> A.  Correct.
>
> Q.  And then you just let him, he was lying there on the grass; right?
>
> A.  Yes.

(*id.* at 308–09).

The prosecutor then questioned him about the discrepancy in his testimony regarding when he realized his pants were down:

Q.      And you testified that it wasn't until you got back home that your clothes were down around your feet, right?

A.      Right.

Q.      But you just told me now that you realized that they were down around your feet while you were having the fight?

A.      Well, when I stood up, yes, his clothes were down, mine were down.

Q.      Which is correct?  When did you first realize your pants were down?

A.      When I got home.  How I do tell you [sic]— I had my pants down, I get down, I fall, it was a struggle, I know what is going on and we fight.

Q.      You did know what was going on then?

A.      Yes, I mean, but —

Q.      I'm just confused.

A.      Me too.

(*id.* at 309–10).  Petitioner admitted that he did not tell the truth about what happened to his mother, stepfather, sister, or the police (*id.* at 311–12).  The prosecutor then asked:

Q.      Isn't it true you did that because you actually do remember what happened and you do remember beating Mr. Pacheco until he was dead?

A.      No.

Q.      Then putting him in the water?

A.      I never put Pacheco in the water.

(*id.* at 312).

The defense rested, and the State called Jessica Lichaczewski as a rebuttal witness.  Ms. Lichaczewski testified that during the five years she had known Mr. Pacheco, when he had a lot to drink, his eyes would dilate, his speech would slur, and he had few motor skills (*id.* at 314).  When the prosecutor asked if he got into fights when he drank heavily, Ms. Lichaczewski responded, "No." (*id.*).  When asked whether Mr. Pacheco was the type of person who fought, Ms. Lichaczewski

testified, "He couldn't fight . . . . He was just like a wimpy type of a person. There's just, there would be no way, he's never, never gotten physical." (*id.* at 315). She testified that when he drank heavily, Mr. Pacheco became flirtatious with women (*id.*). She testified that they had a very honest relationship, and he never indicated he had sexual interest in men (*id.* at 315–16). On cross-examination, Ms. Lichaczewski admitted that Mr. Pacheco became amorous when he drank, but she clarified that he became amorous "when he first started drinking," and then he "would just sit there" and eventually "doze off . . . pass out" (*id.* at 317–18).

Counsel made closing arguments, and the court instructed the jury (*id.* at 321–83). After the jury retired, the record reflects the following:

> THE COURT: Now, I need to put a couple of things on the record that were done in a timely manner. Number one of which was the defendant made a timely motion for judgment of acquittal at the close of the state's case and we're placing it on the record now for convenience sake. Would you like to state your grounds?

> MR. SMITH: Judge, it was our position that the evidence was insufficient for the jury to consider the offense of second degree murder. We feel it [sic] was no evidence of depraved mind that would support a verdict of guilty for second degree murder and asked the court to enter a judgment of acquittal on second degree murder and permit the jury to deliberate only on the offense of manslaughter.

> THE COURT: That was denied then and placing [sic] on the record now. So that motion was denied.

The jury deliberated for forty-nine (49) minutes and returned a verdict of guilty as charged (*id.* at 384–86).

## III.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

(d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Id.</u>, 529 U.S. at 412–13 (O'Connor, J., concurring); <u>Ramdass v. Angelone</u>, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on

---

[2] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it. Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether

its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion." Williams, 529 U.S. at 410–12.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see e.g.* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, 551 U.S. 930, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that

he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

## IV.    EXHAUSTION AND DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[3] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights."  Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim.  Duncan, 513 U.S. at 365–66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277–78.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief.  404 U.S. at 277.  In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," id., 404 U.S. at 278, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

---

[3]Section 2254 provides, in pertinent part:

(b)(1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
        (A)  the applicant has exhausted the remedies available in the courts of the State; or
        (B) (i)  there is an absence of available State corrective process; or
           (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court.  In Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt.  *Id.* 459 U.S. at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)).  The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law."  Anderson, 459 U.S. at 7 (internal quotation marks omitted).  The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim.  *Id.*, 459 U.S. at 7 and n.3.  Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought.  *Id.*

Years later, the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364.  The Duncan Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[4]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court."  Duncan, 513 U.S. at 365–66.  Recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that  "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert

---

[4]The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." Baldwin v. Reese, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004). The Baldwin Court commented that "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" Id., 541 U.S. at 32. With regard to this statement, the Eleventh Circuit stated in McNair v. Campbell, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion. However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'"McNair [v. Campbell], 315 F. Supp. 2d at 1184 (quoting Vasquez v. Hillery, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)). This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302-03 (citations omitted).[5]

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally barred from federal review. Bailey v. Nagle, 172 F.3d 1299, 1302–03 (11th Cir. 1999). This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. See Coleman v. Thompson, 501 U.S. 722, 734-35 and n.1, 111 S. Ct. 2546, 2555 and n.1, 115 L. Ed. 2d 640 (1991); Caniff v. Moore, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally

---

[5] In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005). The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. Id.

defaulted under state law cannot be addressed by federal courts."); Chambers v. Thompson, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991).  In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine.  Bailey, 172 F.3d at 1303.  In the second instance, a federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar.  *Id.*.  A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question.  *See* Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989).  The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question.  Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002).  The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision.  Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001).  First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[6]  Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law.  Third, the state procedural rule must be adequate.  *Id.*  The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion.  *Id.*

To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim.  Tower, 7 F.3d at 210; Parker, 876 F.2d 1470.  "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the

---

[6] The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits.  Marek v. Singletary, 62 F.3d 1295, 1302 (11th Cir. 1995); Alderman v. Zant, 22 F.3d 1541 (11th Cir. 1994).

claim, must have prevented petitioner from raising the claim." McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)). Lack of counsel or ignorance of available procedures is not enough to establish cause. Tower, 7 F.3d at 210. To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." Schlup, 513 U.S. at 327. Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

*Id.*

Within this framework, the court will review Petitioner's claims.

V.      PETITIONER'S CLAIMS

        A.      Ground One: "The state trial court erred by denying Petitioner Ross' motion for judgment of acquittal because the State's evidence failed to prove that Petitioner Ross acted with a depraved mind."

Petitioner contends the evidence was insufficient to sustain his conviction for second degree murder (Doc. 1 at 6). He makes two arguments in support of this claim: (1) the State failed to produce competent substantial evidence inconsistent with his theory of the events, and (2) the State's circumstantial evidence failed to prove second degree murder, that is, that he acted with a depraved mind (Doc. 1 at 6; Doc. 2 at 33–40).

As to the first argument, Petitioner contends that his defense at trial was excusable homicide, specifically, that he and Mr. Pacheco met in a bar after they had both been drinking beer most of the night. They left the bar together and then got into a fight. The fight started when Petitioner awoke and found Mr. Pacheco on top of him and ended when Petitioner knocked Mr. Pacheco out and went home (Doc. 2 at 33, 36). Petitioner argues that the State's evidence failed to rebut this theory

because there was no competent evidence inconsistent with his defense that Mr. Pacheco's death was a killing committed by accident and misfortune resulting from sudden combat (*id.* at 36).

As to the second argument, Petitioner contends that even if the State produced competent substantial evidence inconsistent with excusable homicide, the evidence was not sufficient to prove second degree murder because there was no evidence that the act was done from ill will, hatred, spite, or an evil intent (*id.* at 38–40).

Respondent contends Petitioner failed to exhaust his first argument (that the circumstantial evidence was insufficient because it was not inconsistent with his defense of excusable homicide) because the trial record unambiguously reflects that defense counsel's motion for judgment of acquittal rested solely on the ground that the State failed to present evidence to satisfy the "depraved mind" element and, at best, the State's evidence was only sufficient to submit the case to the jury on the crime of manslaughter. Defense counsel did not assert as a ground for his motion for judgment of acquittal that the State's circumstantial evidence was insufficient to prove second degree murder because it was not inconsistent with his defense of excusable homicide (Doc. 20 at 11–14).

Respondent additionally contends Petitioner may not obtain habeas relief on the "circumstantial evidence rule" part of his claim because it does not present a question of federal constitutional law but is purely a matter of state law (*id.* at 14–15). Respondent argues Florida's "circumstantial evidence rule" is more stringent that the federal sufficiency of the evidence standard, and the federal standard does not require that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt (*id.*). Therefore, the only aspect of Petitioner's claim that is properly subject to federal habeas review is Petitioner's second argument, that is, the State's evidence was insufficient to prove that he acted with a depraved mind (*id.* at 15). As to this aspect of Petitioner's claim, Respondent contends the State's evidence establishes that any rational trier of fact could have found beyond a reasonable doubt that Petitioner killed Mr. Pacheco with "depraved mind" (*id.* at 16–21). Therefore, the requirements of federal due process were satisfied, and Petitioner failed to demonstrate that the state court's denial of relief was

contrary to or an unreasonable application of clearly established federal law, or based upon an unreasonable determination of the facts (*id.* at 21–23).

        1.      Clearly Established Federal Law

As an issue of federal law, Petitioner's claim derives from the Fourteenth Amendment due process requirement that the evidence presented at trial be sufficient to convict. In determining whether Petitioner's conviction was obtained with constitutionally infirm evidence, reference must be made to the substantive elements of the offense as defined by state law. <u>Jackson v. Virginia</u>, 443 U.S. 307, 324 & n.16, 99 S. Ct. 2781, 2792 n.16, 61 L. Ed. 2d 560 (1979). To satisfy the constitutional requirement of due process during trial, the State must prove beyond a reasonable doubt every fact that constitutes an essential element of the crime charged against the defendant. <u>In re Winship</u>, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073, 25 L. Ed. 2d 368 (1970). When reviewing a claim of insufficient evidence, the proper inquiry is not whether the reviewing court itself believes that the evidence established guilt beyond a reasonable doubt, but "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 319 (citation omitted). The court should not reweigh the evidence but should view it in the light most favorable to the jury's verdict. *Id.* Because jurors are free to evaluate the credibility of testimony and the weight of the evidence, the court should assume that all conflicting inferences were resolved against the defendant. *Id.* at 326. The test under <u>Jackson</u> is a limited one, and it does not require that the evidence rule out every hypothesis except that of guilt beyond a reasonable doubt. *Id.*; <u>Wilcox v. Ford</u>, 813 F.2d 1140, 1143 (11th Cir. 1987). "The simple fact that the evidence gives some support to the defendant's theory of innocence does not warrant the grant of habeas relief." <u>Wilcox</u>, 813 F.2d at 1143.

In Florida, when the state relies upon purely circumstantial evidence to convict an accused, the evidence not only must be consistent with the defendant's guilt but also inconsistent with any reasonable hypothesis of innocence. <u>Davis v. State</u>, 703 So. 2d 1055, 1059 (Fla. 1997). Even in a purely circumstantial evidence case, the State is not required to rebut conclusively every possible variation of events that could be inferred from the evidence, but only to introduce competent

evidence that is inconsistent with the defense's version or theory of events.  <u>State v. Law</u>, 559 So. 2d 187, 188–89 (Fla. 1989).  As explained above, however, the federal due process standard does not require the exclusion of any reasonable hypothesis of innocence.  *See* <u>United States v. Herrera</u>, 931 F.2d 761, 763 (11th Cir. 1991) (under federal law, it is not necessary that the evidence exclude every reasonable hypotheses of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt) (citations omitted); *see also* <u>Holland v. United States</u>, 348 U.S. 121, 139–40, 75 S. Ct. 127, 137–38, 99 L. Ed. 150 (1954) (rejecting the vew that where the Government relies on circumstantial evidence, it must "exclude every reasonable hypotheses other than that of guilt").

2.    Federal Review of State Court Decision

Petitioner raised this claim on direct appeal of his conviction, arguing both that the State failed to produce competent substantial evidence inconsistent with his theory of the events, and that the State's circumstantial evidence failed to prove second degree murder, that is, that he acted with a depraved mind (*see* Doc. 20, Ex. H at 32–42).  Although the First DCA's affirmance of the conviction without opinion provides no guidance to this court in determining the rationale for its decision, this court must still defer to the state court decision unless review of the record shows that decision to be unreasonable.  *See* <u>Wright v. Sec'y for Dep't of Corr.</u>, 278 F.3d 1245, 1254–56 (11th Cir. 2002) (holding that a state court decision that does not rest on procedural grounds alone is an adjudication on the merits and, therefore, entitled to deference under the AEDPA, even if the state court decision is not explained in a written opinion, and reviewing state court's rejection of claim to determine whether it was unreasonable application of clearly established federal law).

Under Florida law in effect at the time of Petitioner's offense conduct, second degree murder was defined as follows:

> The unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual, is murder in the second degree and constitutes a felony of the first degree, punishable by imprisonment for a term of years not exceeding life or as provided in s. 775.082, s. 775.083, or s. 775.084.

Fla. Stat. § 782.04(2) (1999).  Thus, to prove the crime of second degree murder, the State was required to prove the following elements beyond a reasonable doubt:  (1) the victim, Caesar Pacheco, is dead, (2) the death was caused by the criminal act of Petitioner, and (3) there was an unlawful killing of Caesar Pacheco by an act imminently dangerous to another and evincing a depraved mind regardless of human life.  *See* The Florida Bar 2007 Florida Standard Jury Instructions in Criminal Cases, Fifth Edition, Part Two:  Instruction on Crimes, Chapter 7.4 Murder - Second Degree (2007) (instruction adopted in 1981 and amended in 1997).  An act is "imminently dangerous to another and demonstrating a depraved mind" if it is an act or series of acts that:  (1) a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another, and (2) is done from ill will, hatred, spite or an evil intent, and (3) is of such a nature that the act itself indicates an indifference to human life.  *Id.*; Conyers v. State, 569 So. 2d 1360, 1361 (Fla. 1st DCA 1990) (citation omitted).

Florida courts have further defined the intent element of second degree murder:

> "Depraved mind" within the second degree murder statute has been variously defined as importing malice in the sense of ill will, hatred, or evil intent, and as an inherent deficiency of moral sense and rectitude.  Ramsey v. State, 114 Fla. 766, 154 So. 2d 855 [Fla. 1934].  It has also been stated that malice is not limited in its meaning to hatred, ill will and malevolence, but "denotes a wicked and corrupt disregard of the lives and safety of others . . . a failure to appreciate social duty."  40 Am. Jur. 2d, Homicide, Section 50.

Hines v. State, 227 So. 2d 334, 335–36 (Fla. 1st DCA 1969); *see also* Gentry v. State, 422 So. 2d 1072, 1073 (Fla. 2d DCA 1982) (crime of second degree murder requires proof of no more than a general intent to commit the imminently dangerous act which results in the unlawful killing).

The evidence admitted at trial showing Petitioner's intent with regard to the killing of Caesar Pacheco included evidence that Petitioner was the aggressor in the altercation with Mr. Pacheco. The medical examiner testified that the cause of Mr. Pacheco's death was homicidal violence including blunt force head trauma and drowning.  She testified that Mr. Pacheco's anal rectal region had a surface tear of the skin and mucosa, accompanied by some blue discoloration or bruising and some blue discoloration or bruising on the right and left sides of his anal canal.  She also testified that Mr. Pacheco had numerous other injuries to his face, head, shoulders, arms, chest, ribs, and hip.

She testified that the knuckle areas of Mr. Pacheco's hands did not show any signs of injury. Jessica Lichaczewski testified that Mr. Pacheco never became physically combative when he drank. Additionally, Petitioner admitted that he was taller and bigger than Mr. Pacheco, and that he kept punching Pacheco until he was unconscious. The evidence of intent did not end there, however. Although Petitioner testified that he abandoned Mr. Pacheco lying unconscious in the grass, believing Pacheco was still alive, the State presented evidence that Petitioner then put Mr. Pacheco in the lake. Investigator Corley testified that he observed blood from the parking lot, through the park, and leading to the water where the victim's body was floating face down out from the seawall, and he found wet clothing in the trunk of Petitioner's car. The evidence adduced at Petitioner's trial, viewed in a light most favorable to the State, was sufficient to permit a rational juror to conclude beyond a reasonable doubt that Caesar Pacheco was killed by an act that a person of ordinary judgment would know is reasonably certain to do serious bodily injury to another, the act denoted a wicked and corrupt disregard for Mr. Pacheco's life and safety, and the act was of such a nature that it indicated an indifference to human life. *See* Coolen v. State, 696 So. 2d 738, 743 (Fla. 1997) (evidence that defendant fatally stabbed victim after arguing with victim over can of beer was sufficient to support second-degree murder conviction); K.B. v. State, 594 So. 2d 825 (Fla. 3d DCA 1992) (evidence that defendant repeatedly stabbed victim and then pursued victim, who was severely injured and unarmed, in attempt to stab victim again supported finding that defendant acted with depraved mind); McCauley v. State, 405 So. 2d 1350, 1351 (Fla. 5th DCA 1981) (at close of State's case, evidence was reasonably susceptible of two different views: that defendant's action in shooting the victim was justifiable self-defense or that such action evinced depraved mind without proper regard for victim's life; therefore trial judge properly denied motion for judgment of acquittal and submitted case to jury).[7] Since a rational trier of fact could have found guilt beyond a

[7] The evidence suggesting that Petitioner was the aggressor and that he put Mr. Pacheco in the lake distinguishes the instant case from those cases where Florida courts have reversed second degree murder convictions because the evidence showed only an impulsive overreaction by the defendant to an attack by the victim. *See* Poole v. State, — So. 3d —, 2009 WL 4931667, at *2 (Fla. 2d DCA 2009) (evidence showed that defendant stabbed victim because he "knew [the victim] was fixing to get me"; thus evidence showed impulsive overreaction by defendant to victim's attack that warranted conviction for manslaughter but not second degree murder); Bellamy v. State, 977 So. 2d 682, 684 (Fla. 2d DCA 2008) (evidence failed to prove that defendant's acts were product of ill will, spite, or evil intent, and thus convictions for second degree murder with a weapon and attempted second degree murder with a weapon required

reasonable doubt as to the second degree murder charge, the undersigned concludes that Petitioner failed to establish that the state court's adjudication of his due process claim was based upon an unreasonable determination of the facts, or was contrary to or an unreasonable application of clearly established Supreme Court law. Therefore, Petitioner is not entitled to federal habeas relief on this claim.

---

reversal; while evidence showed that offenses occurred by defendant's use of knife during fight that occurred in establishment where rock band was playing, defendant did not know either victim, defendant initially approached one victim at the request of the sound engineer and not because he had any problem with victim, and defendant testified that it was only after he was pushed down to ground and his neck was stepped on that he took knife to get people off him); Light v. State, 841 So. 2d 623, 626 (Fla. 2d DCA 2003) (State failed to present competent, substantial evidence such that trier of fact could have found beyond reasonable doubt that defendant's acts were product of ill will, spite, or evil intent, and thus second-degree murder conviction required reversal; best evidence for State suggested that defendant, who allegedly slammed victim to floor in mosh pit at bar and rendered him unconscious, was simply guilty of serious, momentary misjudgment concerning amount of force that was permissible on dance floor or that he reacted impulsively and excessively to being hit in genitals by victim); Rayl v. State, 765 So. 2d 917, 919–20 (Fla. 2d DCA 2000) (State failed to establish defendant acted with depraved mind, as required to establish second degree murder; although witness saw victim on knees before second shot was fired, witness left before second shot was fired, defendant testified that victim was coming out his crouch toward defendant when defendant fired second shot, and fact that defendant was standing with arms folded when officers arrived was insufficient to prove ill will given evidence that defendant checked on victim but saw no blood, and thus, refrained from applying pressure to wound); Williams v. State, 674 So. 2d 177, 178 (Fla. 2d DCA 1996) (evidence was insufficient to support conviction for second degree murder where evidence showed that victim was belligerently drunk on day in question and started fight with defendant; defendant was recuperating from surgery on his arm several weeks before to repair serious damage from previous auto accident; entire incident began in backyard of victim's home with victim's behavior necessitating that police be called to subdue him; after police left the second time, victim continued to press fight with defendant, moving it indoors to both defendant's room and hallway outside it; and after using their fists on each other for some time, defendant pulled knife from his belt and stabbed victim in abdomen, fatally wounding him); McDaniel v. State, 620 So. 2d 1308, 1308 (Fla. 4th DCA 1993) (State failed to prove prima facie case of second degree murder where evidence showed that victim initiated altercation with defendant by hitting him in the mouth and knocking him to the ground; although defendant's use of knife to ward off further attack may have been excessive, thereby negating a finding of self-defense, his acts did not evince depraved mind; no evidence was presented that defendant acted out of ill will, hatred, spite, or an evil intent); Andrews v. State, 577 So. 2d 650, 652 (Fla. 1st DCA 1991) (jury could not convict defendant of second degree murder based on evidence that she stabbed victim during fight which victim had initiated and while victim was choking her); Borders v. State, 433 So. 2d 1325, 1326 (Fla. 3d DCA 1983) (requisite evidence, evincing depraved mind regardless of human life essential to charge of second degree murder, was not present in situation where defendant apparently struck out at her husband with kitchen knife after being shoved and forced backward during domestic quarrel); Pierce v. State, 376 So. 2d 417, 418 (Fla. 3d DCA 1979) (no basis for finding that defendant acted with depraved mind where undisputed evidence showed that homicide occurred only at culmination of fight which was started by victim without justification and in which defendant was only a reluctant participant); Martinez v. State, 360 So. 2d 108, 109 (Fla. 3d DCA 1978) (State failed to establish that defendant killed victim with depraved mind regardless of human life where overwhelming evidence showed that defendant killed victim shortly after (1) defendant responded to his daughter's telephone call to him to come to her and victim's house (defendant's daughter and the victim were married) to protect her against physical attack by victim, and (2) defendant was physically assaulted by victim upon his arrival at victim's house).

**B.** Ground Two: "Defense counsel rendered ineffective assistance of counsel by depriving Petitioner Ross of his right to make a knowing, intelligent, and voluntary decision as to whether he should testify at trial."

Petitioner claims that defense counsel decided that Petitioner would testify without giving him the option of declining to testify (Doc. 1 at 6). He contends that prior to trial, defense counsel told the local media that Petitioner would testify at trial, without discussing the issue with Petitioner or obtaining his consent (Doc. 2 at 41). Furthermore, in his opening statement, defense counsel informed the jury that Petitioner would testify, without discussing this decision with Petitioner (*id.*). Petitioner states that on the morning that the defense presented its case, defense counsel discussed with him, in a conversation lasting 20–30 minutes, whether he should testify (*id.*). Petitioner states defense counsel told him that he had no choice but to testify because he (counsel) had informed the media and the jury that he would (*id.* at 41–42). Petitioner states he told defense counsel that he did not want to testify because the State had not proved its case nor connected him to the crime scene, and he did not want the jury to learn that he was a convicted felon (*id.* at 42). Petitioner states defense counsel did not inform him that the decision whether to testify was one that only he could make (as opposed to counsel) (*id.* at 44). Petitioner states defense counsel did not prepare him to testify, and counsel called him as a witness despite Petitioner's objection (*id.* at 42–43). Petitioner argues that counsel effectively deprived him of his right to make a voluntary decision about testifying by telling the media and the jury that he would testify (*id.* at 43–44). Additionally, counsel deprived him of his right to make a knowing and intelligent decision by failing to prepare him for his testimony (*id.* at 44).

Respondent states that this claims appears to be exhausted, but Petitioner is not entitled to federal habeas relief on this claim (Doc. 22 at 23–29).

1.      Clearly Established Federal Law

A criminal defendant's right to testify on his own behalf "is one of the rights that 'are essential to due process of law in a fair adversary process,'" and it is "[e]ven more fundamental to a personal defense than the right of self-representation." Rock v. Arkansas, 483 U.S. 44, 51–52, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987) (quoting Faretta v. California, 422 U.S. 806, 819 n.15, 95 S. Ct. 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975)) (finding right rooted in Due Process Clauses

of Fifth and Fourteenth Amendments, in Compulsory Process Clause of Sixth Amendment, and in Fifth Amendment guarantee against compelled testimony). This right is personal to the defendant and cannot be waived either by the trial court or by defense counsel. *See* Gallego v. United States, 174 F.3d 1196, 1197 (11th Cir. 1999) (citing United States v. Teague, 953 F.2d 1525, 1532 (11th Cir. 1992)). The appropriate vehicle for a claim that defense counsel's acts led to a violation of this right, either because counsel failed to inform the defendant of his right to testify or because counsel forced him to testify, is an ineffective assistance of counsel claim. *See* Teague, 953 F.2d at 1534; *see also* Brown v. Artuz, 124 F.3d 73, 77–78 (2d Cir. 1997).

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. 466 U.S. at 687–88. If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697. Thus, this court need not address the prejudice prong if the court determines that the performance prong is not satisfied. Turner v. Crosby, 339 F.3d 1247, 1279 (11th Cir. 2003); Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation omitted).

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688–89. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for

example, what witnesses he presented or did not present—were acts that some lawyer might do." Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15). Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").

      2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground (h) in his Rule 3.850 motion (Doc. 22, L at 99–100). Petitioner appealed the state court's denial of relief by asserting it as Issue #2 in his pro se initial brief (Doc. 22, Ex. V). That decision was affirmed by the First DCA (Doc. 22, Ex. W). While the affirmance was a per curiam opinion without reasoning, this court presumes that the First DCA's decision affirms the reasoning, as well as the judgment of the circuit court. "'Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.'" Sweet v. Sec'y Dept. of Corr., 467 F.3d 1311, 1316–17 (11th Cir. 2006) (quoting Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S. Ct. 2590, 2594, 115 L. Ed. 2d 706 (1991)); see also Harmon v. Barton, 894 F.2d 1268, 1273 (11th Cir. 1990) (noting that the "clear inference" to be drawn from a per curiam affirmance without written opinion is that the appellate court "accepted not only the judgment but the reasoning of the trial court.").

In the trial court's written opinion denying Petitioner's claim, the court identified the Strickland standard as the controlling legal standard for analyzing claims of ineffective assistance of counsel (Doc. 22, Ex. S at 159). Because the state court correctly identified Strickland as the governing precedent, Petitioner is entitled to federal habeas relief only if he demonstrates that the state court decision was based upon an unreasonable determination of the facts or that the state court decision was an unreasonable application of Strickland.

The state court found as fact that Walter Smith, Petitioner's defense counsel at trial, had tried at least 40 first degree murder cases and over 75 second degree murder cases in that state circuit court (Doc. 22, Ex. S at 159). The court further found that Attorney Smith's experience was "vast," and the choices he made were strategic ones (*id.*). The court found that Attorney Smith testified at the evidentiary hearing that he discussed the issue of whether Petitioner should testify with Petitioner, and Petitioner chose to testify (*id.* at 158). The court found Attorney Smith's testimony credible and denied relief.

Petitioner contends the state court's credibility determination was based upon an unreasonable determination of the facts because Petitioner testified at the evidentiary hearing that he told Attorney Smith at trial that he did not want to testify, but Smith told him that he had to testify (*see* Doc. 28 at 6). Petitioner asserts that Attorney Smith conceded at the evidentiary hearing that he had no independent recollection of meeting with Petitioner concerning whether Petitioner should testify (*id.*). Petitioner further contends that Attorney Smith admitted that he told Petitioner that "his only choice" was to testify (*id.*). Therefore, there was no evidence refuting Petitioner's testimony that Smith told him he had no choice but to testify (*id.*). Petitioner additionally contends Attorney Smith's statement during closing argument at Petitioner's trial that "[H]e [Petitioner] didn't really want to talk about it today" supported Petitioner's assertion that he did not want to testify, thereby refuting the state court's factual findings.

Determinations of credibility are best made by the trial court judge who can assess the demeanor and candor of the witnesses. Gore v. Sec'y for Dep't of Corr., 492 F.3d 1273, 1300 (11th Cir. 2007) (noting that while reviewing court also gives a certain amount of deference to credibility determinations, that deference is heightened on habeas review) (citing Rice v. Collins, 546 U.S. 333, 341–42, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006) (stating that "[r]easonable minds reviewing the record might disagree about the [witness'] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination")); *see also* Baldwin v. Johnson, 152 F.3d 1304, 1317 (11th Cir. 1998) (citing Marshall v. Lonberger, 459 U.S. 422, 434, 103 S. Ct. 843, 74 L. Ed. 2d 646 (1983) ("Title 28 U.S.C. § 2254(d) gives federal habeas [corpus] courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but

not by them.")); <u>Smith v. Kemp</u>, 715 F.2d 1459, 1465 (11th Cir. 1983) ("Resolution of conflicts in evidence and credibility issues rests within the province of the state habeas court, provided petitioner has been afforded the opportunity to a full and fair hearing.").

Review of the record in this case yields no suggestion that the trial court's findings of fact made during the state post-conviction proceeding were not supported by the record. At the first evidentiary hearing on Petitioner's Rule 3.850 motion, Petitioner admitted that after the State had presented its case and before the defense presented its case, he and defense counsel discussed for 20–30 minutes whether or not he should take the stand (Doc. 22, Ex. P at 190–91). He further stated that Attorney Smith told him he had talked to the media, and Petitioner had no other choice (*id.* at 191). On cross-examination Petitioner testified that he had "an opportunity [on the day of trial] to discuss" with Attorney Smith "whether or not to take the stand," and during this discussion Petitioner told Attorney Smith his "feelings" about testifying, that is, that he did not want to take the stand (*id.* at 201).

Attorney Smith testified that although he did not have any independent recollection of talking to Petitioner the day that Petitioner testified, he was certain that he did (*id.* at 185). The parties agreed to a continuance of the evidentiary hearing to permit Attorney Smith an opportunity to review the trial transcript and to permit Petitioner's post-conviction counsel to gather further evidence and witnesses (*id.* at 187–89, 207–08). At the continued evidentiary hearing, Attorney Smith testified that he and Petitioner discussed the issue of his testifying on several occasions, including the afternoon before or the morning of Petitioner's testimony "to make sure that's what he wants to do" and to ensure Petitioner understood what Smith would be asking him on direct examination (Doc. 22, Ex. Q at 228). Smith testified he was "sure that occurred" (*id.*). Smith disagreed with Petitioner's testimony that the only time they discussed the issue was the morning he testified, "[I]t's not something that I would do on the morning of trial. It's something that you would develop over the course of the representation, which is probably about six months, and it's something that, you know, I would certainly bring up the subject before the morning of trial." (*id.* at 18). He testified further:

> [A]ll I can tell you is that during my meetings with him in a case like this
> with the facts that were presented, the only chance he's got really is to tell a credible

story to the jury about what happened out there at the lake, and I'm sure I brought that up with him pretty early on because the facts alone did not paint a pretty picture and the only way I saw that he had a chance of escaping a conviction for second degree murder is if he told us a story that either fell under the rubric of justifiable homicide or excusable homicide. I mean that was his only choice. He didn't want to plead to second degree murder and so we had to go to trial and that's the only defense I could come up with.

(*id.* at 230).

Petitioner has failed to present clear and convincing evidence to rebut the state court's finding that Smith discussed the issue of whether Petitioner should testify with Petitioner, and Petitioner chose to testify. Petitioner suggests that Attorney Smith's post-conviction testimony, "I mean that was his only choice" is evidence that Smith advised Petitioner he had no choice but to testify. However, Petitioner mischaracterizes counsel's testimony; counsel's statement was merely an explanation of his belief that the only viable defense to the second degree murder charge was that it was justified or excusable and, as a practical matter, Petitioner's testimony was essential to any realistic chance of succeeding with an excusable homicide defense. Petitioner additionally suggests that Attorney Smith's acknowledgment during closing argument at trial that Petitioner "didn't really want to talk about it today" rebuts the state court's finding that he chose to testify. However, this statement, when viewed in its context, shows that counsel was not admitting that Petitioner testified against his will; he was merely attempting to humanize Petitioner to the jury by explaining why Petitioner did not want to tell anyone about the sexual nature of his fight with Mr. Pacheco (*see* Doc. 22, Ex. B at 360–62). Therefore, Petitioner failed to present clear and convincing evidence that rebuts the state court's findings that defense counsel discussed with Petitioner the issue of whether Petitioner should testify, and Petitioner chose to testify. Accordingly, those findings are presumed correct. *See* 28 U.S.C. § 2254(e)(1); Miller-El, 537 U.S. at 340.

In light of the state court's findings, Petitioner failed to establish that counsel's performance was constitutionally deficient. The advice provided by a criminal defense lawyer on whether his client should testify is "a paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance." Hutchins v. Garrison, 724 F.2d 1425, 1436 (4th Cir. 1983); Rogers-Bey v. Lane, 896 F.2d 279, 283 (7th Cir. 1990) (concluding that counsel's advice not to

testify, based in part on erroneous belief that defendant could be impeached by prior conviction, was not deficient performance); Reyes-Vejerano v. United States, 117 F. Supp. 2d 103, 108–09 (D.P.R. 2000) ("Absent evidence of coercion, legal advice concerning the defendant's right to testify does not constitute [ineffective assistance of counsel]."). In the instant case, Attorney Smith was not unreasonable in recommending that Petitioner testify and advising him, even in the most forceful of terms, that his testimony was necessary for success of the excusable homicide defense. *See* Teague, 953 F.2d at 1533 (observing that when counsel has formed an opinion whether his client should testify, he should advise his client "in the strongest possible terms"). In fact, the advice of Petitioner's defense counsel that he testify was a sound strategy, in light of the evidence that Mr. Pacheco's death was caused by homicidal violence and drowning, Petitioner and Mr. Pacheco were seen leaving a bar at the same time just hours before Mr. Pacheco's beaten body was found floating in the lake, and Petitioner's blood was found on a wooden post at the crime scene. On this record, counsel's performance was far from deficient. As such, the state court's determination that counsel did not render unconstitutionally ineffective assistance in advising Petitioner concerning his right to testify was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law.

      C.    <u>Ground Three: "Defense counsel rendered ineffective assistance of counsel by failing to argue that State witness John Corley should not have been allowed to give expert testimony and opinions without first being qualified as an expert; defense counsel was also ineffective for calling John Corley as a defense witness."</u>

      Petitioner contends defense counsel was ineffective for failing to argue that Investigator Corley should not have been permitted to give expert testimony and opinion without first being qualified as an expert (Doc. 1 at 7). Petitioner asserts Corley testified at trial that he observed "drag marks" and "dropped" blood at the crime scene even though he was not qualified as a forensic expert (*id.*; Doc. 2 at 46–47). Petitioner contends that for the same reasons, defense counsel was ineffective for calling Investigator Corley as a defense witness as it simply provided Corley another opportunity to give impermissible lay opinion (*id.*).

      Petitioner raised Ground Three as Grounds (c) and (n) in his Rule 3.850 motion (Doc. 22, L at 96–97, 102). The trial court denied Grounds (c) and (n) on the merits (Doc. 22, Ex. O at

134–35, 136).  Where, as here, Petitioner's motion was denied following an evidentiary hearing, notwithstanding that the hearing was limited in scope to only seven of his seventeen claims, he was required to file an appellate brief.  *See* Fla. R. App. P. 9.1419b)(3).  Petitioner filed a brief, but he failed to address these particular issues (*see* Doc. 22, Ex. V).  This constituted an abandonment of those issues on appeal.  *See* <u>Sweet v. State</u>, 810 So. 2d 854, 870 (Fla. 2002) (holding that claims raised on appeal from order denying post-conviction relief were procedurally barred where defendant received an evidentiary hearing on his Rule 3.850 motion (albeit not on those particular claims) and failed to fully brief the claims on appeal); <u>Reed v. State</u>, 875 So. 2d 415 (Fla. 2004) (where some of defendant's post-conviction claims were summarily denied and others were subject of evidentiary hearing, appellate court reviewed only those summarily denied claims that defendant raised in his appellate brief); <u>Johnson v. State</u>, 769 So. 2d 990, 1005–06 (Fla. 2000); *see also*, <u>Sharp v. McNeil</u>, No. 4:07-cv-17-MP-MD, 2009 WL 981594, at **13–14 (N.D. Fla. Apr. 10, 2009) (unpublished); <u>Durain v. McNeil</u>, No. 2:08-cv-24-FTM-29DNF, 2008 WL 4888989, at *9 (M.D. Fla. Nov. 12, 2008) (unpublished); <u>Williams v. McDonough</u>, No. 8:02-CV-965-T-30MAP, 2007 WL 2330794, at **1–2 (M.D. Fla. Aug. 14, 2007) (unpublished); <u>Walker v. Sec'y, Dep't of Corr.</u>, No. 8:05-cv-1539-T-17MAP, 2007 WL 1747181, at *4 (M.D. Fla. June 18, 2007) (unpublished).[8] Therefore, Ground Three was not properly exhausted.[9]  Moreover, Petitioner cannot now return to the state courts to attempt to successfully exhaust the claims presented in Ground Three, because he would be barred under Florida's procedural rules.  *See* Fla. R. Crim. P. 3.850(b) (providing, in part, with exceptions not relevant here, that no Rule 3.850 motion "shall be filed or considered pursuant to this rule if filed more than 2 years after the judgment and sentence became final."); Fla. R. Crim. P. 3.850(f) (providing for the dismissal of successive rule 3.850 motions).  Therefore, Ground three is considered procedurally defaulted.

---

[8] The undersigned cites <u>Sharp</u>, <u>Durain</u>, <u>Williams</u>, and <u>Walker</u> only as persuasive authority and recognizes that the opinions are not considered binding precedent.  *See* 11th Cir. R. 36-2.

[9] As previously noted, Respondent did not expressly waived the exhaustion requirement in this case (*see* Doc. 31).

Petitioner has failed to show cause and prejudice to excuse the procedural default. Additionally, he has failed to establish entitlement to federal review through the fundamental miscarriage of justice gateway, as discussed *infra*. Therefore, Petitioner is not entitled to federal habeas relief on this claim. *See* Alexander v. Johnson, 163 F.3d 906, 908 (5th Cir. 1998) ("Although AEDPA authorizes a district court to *deny* relief on an unexhausted claim, it does *not* authorize a district court to *grant* relief on an unexhausted claim, "unless the State, through counsel, expressly waives the requirement."); Lambert v. Blackwell, 134 F.3d 506, 515 (3d Cir. 1998); Miller v. Dretke, 431 F.3d 241, 245 (5th Cir. 2005) ("under § 2254(b)(2) we can *deny* (but *not* grant) Miller's non-exhausted claims"); Jones v. Jones, 163 F.3d 285, 299 (5th Cir. 1998).

D.     Ground Four: "Defense counsel rendered ineffective assistance of counsel by failing to request the appointment of an independent forensic pathologist and an independent crime scene expert."

Petitioner contends defense counsel performed ineffectively by failing to seek appointment of an independent forensic pathologist and an independent crime scene expert (Doc. 1 at 7–8; Doc. 2 at 51–53).  Petitioner contends that if defense counsel had requested appointment of a forensic pathologist and a crime scene expert, the result of the trial would have been different (Doc. 2 at 51).

In support of his claim, Petitioner submitted a report of Michael E. Berkland, a consultant who provides forensic expertise in forensic pathology to include injury analysis, crime scene analysis, and crime scene or event reconstruction (*see* Doc. 2, Ex. 1, Expert Report of Michael E. Berkland, DO).  In his report dated February 12, 2007, Mr. Berkland states that prior to his opening his consulting practice, he was employed in the role of a forensic pathologist and/or Medical Examiner, with approximately 7 1/2 of the last 10 years as a medical examiner within the First Judicial Circuit of the State of Florida (*id.*, Berkland Report ¶ 3).  Mr. Berkland states that despite Mr. Pacheco's having significant closed head trauma and a markedly elevated blood ethanol level, neither Dr. Hermann nor defense counsel ever "brought up" the possibility of Mr. Pacheco's crawling, stumbling, or falling over the seawall into shallow water and drowning on his own accord without assistance from any other individual (*id.*, ¶ 12).  Mr. Berkland states that Mr. Pacheco had sufficient head trauma and intracranial pathology to have been disoriented as a result of concussion, without factoring in the disorientation from his elevated blood ethanol level (*id.*, ¶ 13).  Berkland

states that given the fact that Dr. Hermann could not state within any medical certainty what the mechanism of death was and because several of the possible mechanisms stated by her "invoke a rule on a different cause of death," it was not possible, within reasonable medical certainty, to state a cause of death in this case (*id.*, ¶ 18). With regard to crime scene evidence, Mr. Berkland states that Investigator Corley had no scientific basis for stating that Mr. Pacheco was dragged to the seawall and placed in the water because there is no photographic evidence that depicts "drag marks," and the "scant" sampling of grass taken by Corley between the area of the heavy blood soakage in the grass and the seawall does not scientifically indicate that a body was dragged, but simply that blood was deposited there either by gravity or contact transfer (*id.*, ¶¶ 14–16). Mr. Berkland opines that because only two of the three forensic possibilities were presented (that is, Mr. Pacheco was either drowned while alive in the water during the fight or was unconscious and placed into the water by another to drown), the court was "unfairly biased" in that the "equally likely" third possibility was never presented, nor was an expert retained that could proffer that testimony (*id.*, ¶¶ 11, 19). Mr. Berkland states that based upon the autopsy findings and analysis of Investigator Corley's testimony, reports, and photographs, it is his opinion that the <u>cause</u> of Mr. Pacheco's death is best ruled as "Undetermined" and that a determination of how he came to be in the water is not able to be made within a reasonable scientific certainty; although Berkland states that the <u>manner</u> of Mr. Pacheco's death is a homicide (*id.*, ¶ 21).

Petitioner states he raised this claim in his Rule 3.850 motion, but at the evidentiary hearing on October 22, 2004, his post-conviction counsel waived the claim (Doc. 2 at 51). As cause for failure to exhaust the claims, Petitioner states that the waiver was involuntary. He asserts that a discussion was held during a sidebar at the evidentiary hearing, and after the sidebar, his post-conviction counsel announced that the claims would be waived and that the state court would agree to a continuance to allow counsel to locate two witnesses (James Patillo and Donald Taylor) (*id.* at 52 & n.22). Petitioner claims that during the sidebar, the state court judge told Petitioner's counsel that counsel would not be permitted to pursue his claim regarding Mr. Patillo and Mr. Taylor unless he agreed to waive the claim regarding the independent experts, thus requiring him to choose between two valid post-conviction claims (*id.*). Petitioner also contends he is entitled to federal

review of this claim because this court's failure to consider it will result in a fundamental miscarriage of justice (*id.*).

In support of his "cause and prejudice" argument, Petitioner submitted affidavits from his mother and her husband, Connie and Eugene Hester (*see* Doc. 2, Exs. 2, 3). Connie Hester relays a conversation she had with Petitioner's post-conviction counsel, Mr. Ben Bollinger, after the first evidentiary hearing. Mrs. Hester states that during the conversation, Mr. Bollinger stated that Petitioner wanted to present several issues to the court, but he (Bollinger) would not be able to address all of them because the judge would not agree to it (Doc. 52, Ex. 2, Affidavit of Connie Hester). Mrs. Hester states Mr. Bollinger told her that he talked with Judge Costello, the presiding judge, and she (Judge Costello) told him that he could pursue the issue involving the two post-conviction witnesses if he would agree to drop the expert witness issue and several other issues (*id.*). Mrs. Hester states Mr. Bollinger told her that Petitioner's best course of action was to pursue the issue involving the two post-conviction witnesses, so she in turn told Petitioner to follow Mr. Bollinger's advice (*id.*).

Eugene Hester states that he and Mr. Bollinger discussed the fact that Petitioner wanted to pursue several issues in the post-conviction proceeding, and Mr. Bollinger told him that the judge would not allow him to pursue some of the issues, so there was "no way to bring them before the court" (Doc. 2, Ex. 3, Affidavit of Eugene Hester). Mr. Hester states Mr. Bollinger stated that the judge would allow him to present the testimony of the two post-conviction witnesses, but would not allow the other issues to be heard (*id.*).

Respondent contends the issues raised in Ground Four are unexhausted and procedurally defaulted (Doc. 20 at 39–40). Respondent further contends Petitioner cannot satisfy the "cause and prejudice" exception to the procedural bar because the affidavits of Mr. and Mrs. Hester are based upon double hearsay (Mr. Bollinger's out-of-court statements regarding Judge Costello's out-of-court statements), not their personal knowledge (*id.* at 42). Respondent further contends Petitioner's allegations of cause are belied by the record. Respondent states that at the first post-conviction evidentiary hearing on October 22, 2004, the first witness called by Petitioner's counsel was Walter Smith, Petitioner's trial counsel, but his testimony was continued to provide him an opportunity to

review the trial transcripts (*see* Doc. 22, Ex. P at 188–89, 209–10). Petitioner's counsel then called Petitioner as a witness. After Petitioner testified, the following occurred:

> THE COURT: You [Petitioner] may step down, sir. Do you have any other evidence?
>
> MR. BOLLINGER: Just Mr. Smith, Your Honor.
>
> THE COURT: Let me talk to y'all at side bar for just a second.
>
> (Side bar conference—not reported)
> (Upon resuming–In Open Court)
>
> MR. BOLLINGER: Judge, if I could take a minute to speak to my client?
>
> THE COURT: Certainly.
>
> (Pause)
> (Upon resuming)
>
> MR. BOLLINGER: Judge, I have conferred with my client and based on the fact that we just got a transcript, I know Mr. Smith needs time to review those and also I spoke with him based on his testimony, I would like to have Mr. James Patello and Donnie Nelson present and I may also want to call his mother.[10]
>
> We're at this time going to withdraw an [sic] arguments in regards to the crime scene experts and the dermatologist and the independent experts on this based on the fact that, my discussions with him just a minute ago.
>
> THE COURT: All right.
>
> MR. BOLLINGER: So we would ask for that to be stricken from the Motion and let me have a chance to locate these other two witnesses. I have his mother here but I have not talked with her about any testimony so I think it would be appropriate for my client to be continued in this matter.
>
> THE COURT: Does the State have any objections?

---

[10] The names of the two additional witnesses were James Patillo and Donald Taylor (*see* Ex. Q).

MS. O'CONNOR:  No, Your Honor, just as long as the Court's aware that this is what Mr. Ross indeed wants to do.

THE COURT:  Now, Mr. Ross is that what you've agreed to?

THE DEFENDANT:  So agreed.

THE COURT:  All right.  So you understand the only witnesses that he's going to be investigating are the two witnesses that you say can testify about your injuries?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  And other expert, so called, expert type of people will not be called.

THE DEFENDANT:  Correct.

THE COURT:  Okay, that's fine.  Then we'll continue this matter.  I want your lawyer to have enough opportunity to get this presented to me with all the information that I'll need to review it.  So we're going to reschedule it and, you know, it may be awhile.

(Doc. 22, Ex. P at 207–09).

Respondent contends this record demonstrates that Petitioner's abandonment of the claims regarding expert witnesses was not based upon any alleged ultimatum by the judge, but was a voluntary decision by Petitioner based upon the advice of his post-conviction counsel (Doc. 22 at 45–46).  Furthermore, Petitioner did not present his allegations of pressure by the trial judge on appeal from the judge's denial of post-conviction relief (*id.*).

Regarding Petitioner's seeking review under the fundamental miscarriage of justice exception to the procedural bar, Respondent contends Petitioner has not alleged a claim of actual innocence.  Therefore, he is not entitled to federal review of his claim (*id.* at 40–41).

Initially, the record demonstrates that Petitioner failed to exhaust his state court remedies as the claims raised in Ground Four.  He presented his claims as Grounds (l) and (m) in his Rule 3.850 motion (Doc. 22, Ex. L at 101–02).  However, as the portion of the evidentiary hearing set forth *supra* demonstrates, Petitioner abandoned those issues in the Rule 3.850 proceedings.  *See* <u>Reaves</u>

_v. State_, 826, So. 2d 932, 942 (Fla. 2002) ("[W]here a defendant fails to pursue a claim . . . at the trial court, he waives such claim and cannot raise it on appeal with this Court."). Moreover, Petitioner cannot now return to the state courts to attempt to successfully exhaust the claims presented in Ground Four, because he would be barred under Florida's procedural rules. _See_ Fla. R. Crim. P. 3 .850(b) (providing, in part, with exceptions not relevant here, that no Rule 3.850 motion "shall be filed or considered pursuant to this rule if filed more than 2 years after the judgment and sentence became final."); Fla. R. Crim. P. 3.850(f) (providing for the dismissal of successive rule 3.850 motions). Therefore, Ground Four is considered procedurally defaulted.

Additionally, Petitioner has failed to demonstrate that Judge Costello forced him to abandon his claim in Ground Four. The record demonstrates that the state court granted Petitioner an evidentiary hearing on the claims raised in Ground Four and appointed Mr. Bollinger as counsel for Petitioner. At the first evidentiary hearing, Judge Costello imposed no restrictions on Attorney Bollinger's presentation of evidence, which consisted only of testimony from Attorney Walter Smith and Petitioner (Doc. 22, Ex. P at 184–207). The record further demonstrates that after Petitioner testified, Mr. Bollinger conferred with Petitioner and announced that he wished to continue the proceedings to permit Attorney Smith to review the trial transcripts and to facilitate his (Bollinger's) presenting testimony from two or three more witnesses (_id._ at 207–08). Attorney Bollinger also announced that, pursuant to his consultation with Petitioner, he wished to abandon certain claims, including the claims raised in Ground Four (_id._ at 208). Petitioner asserts that Judge Costello would not allow him to present evidence on all of his claims, and told Attorney Bollinger, allegedly during the sidebar conference between counsel and Judge Costello, that he could pursue the issue involving Mr. Patillo and Mr. Taylor only if he would abandon the remaining issues. However, the only factual support for this assertion is the Hesters' affidavits, which include double hearsay statements as to the substance of Judge Costello's statements during sidebar; the Hesters do not allege to have personal knowledge of the substance of the sidebar discussion. Therefore, the affidavits are insufficient to support Petitioner's assertion that Judge Costello forced him to abandon his claims. Furthermore, Petitioner's statements in open court demonstrate that he unequivocally agreed with the position announced by his counsel (_id._ at 208–09). "Solemn declarations in open court carry a

strong presumption of verity." <u>Blackledge v. Allison</u>, 431 U.S. 63, 73–74, 97 S. Ct. 1621, 1629, 52 L. Ed. 2d 136 (1977). Such statements are presumptively trustworthy and are considered conclusive absent compelling evidence showing otherwise. *Id.* Moreover, Petitioner does not allege he made any effort to withdraw his waiver on the ground that it was involuntary. Therefore, Petitioner has failed to demonstrate cause for his failure to exhaust Ground Four in the state courts.

Additionally, Petitioner has failed to demonstrate he is entitled to review under the fundamental miscarriage of justice exception. As previously discussed, to satisfy the miscarriage of justice exception, Petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." <u>Schlup</u>, 513 U.S. at 327. "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." *Id.* Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

*Id.*

In the instant case, Mr. Berkland's report does not clear Petitioner from guilt for causing Mr. Pacheco's death. The report does not cast any doubt on Dr. Hermann's findings as to the injuries she observed on Mr. Pacheco's body, nor does it cast doubt on Dr. Hermann's determination that the manner of Mr. Pacheco's death was homicide. Furthermore, Mr. Berkland's report does not cast any doubt on the following facts: (1) Mr. Pacheco was last seen with Petitioner, (2) Petitioner's blood and Mr. Pacheco's blood were found in the park, (3) Petitioner beat Mr. Pacheco until he was unconscious, and (4) Mr. Pacheco's dead body was found in the water near the park. Mr. Berkland merely opines that the actual cause of Mr. Pacheco's death could not be determined, and he proposes a third theory of how Mr. Pacheco's body could have ended up in the water. Petitioner has failed to show that it is more likely than not that no reasonable juror would have convicted him if the information in Mr. Berkland's report had been presented at trial. Therefore, he has failed to present a colorable claim of actual innocence.

E.      Ground Five: "Defense counsel rendered ineffective assistance of counsel by failing to present (at trial) the testimony of James Patillo and Donald Taylor."

Petitioner contends defense counsel rendered constitutionally ineffective assistance by failing to present the testimony of James Patillo and Donald Taylor at trial (Doc. 1 at 8; Doc. 2 at 53–54). Petitioner states the prosecutor relied upon the scrapes, bruises, and cuts on Petitioner's body to support its argument that he was involved in a fight with Mr. Pacheco that resulted in Pacheco's death (*id.*). He states that prior to trial, he advised defense counsel that he incurred the injuries at work, and Petitioner provided counsel with the names and contact information of two witnesses who could verify this, namely, Mr. Patillo and Mr. Taylor (*id.*). Petitioner asserts that if counsel had presented the testimony of these two witnesses, the result of his trial would have been different (*id.*).

Respondent contends Petitioner failed to exhaust this claim because he failed to raise it in his brief on appeal of the trial court's denial of his Rule 3.850 motion (Doc. 22 at 46–47). Respondent further contends Petitioner failed to show cause for his failure to present the claim on appeal and prejudice resulting therefrom (*id.* at 48). Alternatively, Respondent contends Petitioner's claim fails on the merits (*id.* at 48–56).

Petitioner raised Ground Five as Ground (i) in his Rule 3.850 motion (Doc. 22, L at 100). The trial court denied the claims on the merits (Doc. 22, Ex. S). Petitioner filed a brief on appeal of the court's denial of the motion, but he failed to address this issue in his brief (*see* Doc. 22, Ex. V). This constituted an abandonment of those issues on appeal. *See* Duest v. Dugger, 555 So. 2d 849, 851–52 (Fla. 1990) (holding that issues raised on appeal from order denying post-conviction relief were procedurally barred where petitioner received an evidentiary hearing on his Rule 3.850 motion and failed to fully brief and argue the points on appeal). Therefore, Ground Five is procedurally defaulted. *See* Atwater v. Crosby, 451 F.3d 799, 810 (11th Cir. 2006) (holding that petitioner, who had received an evidentiary hearing on his Rule 3.850 motion, procedurally defaulted his right-to-testify claim when he failed to argue it in his initial brief on appeal from the denial order; raising it in his reply brief was not proper exhaustion); Cortes v. Gladish, 216 Fed. Appx. 897, 899-900 (11th Cir. 2007) (stating that had the petitioner received an evidentiary hearing on his Rule 3.850 motion, his failure to address issues in his appellate brief would constitute a waiver of those issues, and they would be considered procedurally defaulted).

Petitioner has made none of the requisite showings to excuse his default. He has not alleged cause for his default, and has failed to make a colorable showing of his actual innocence, as discussed *supra*. Therefore, he is not entitled to federal habeas relief on Ground Five.

F.     <u>Ground Six: "Defense counsel rendered ineffective assistance of counsel by conceding in opening argument that Petitioner Ross was involved in an altercation with the victim and for failing to discuss this strategy with Petitioner Ross prior to trial."</u>

G.     <u>Ground Seven: "Defense counsel rendered ineffective assistance of counsel by misadvising Petitioner Ross to reject the State's plea offer."</u>

In Ground Six, Petitioner asserts that during opening "argument," defense counsel told the jury that Petitioner acted "violently" and "attack[ed]" the victim and "beat[ ]" him (Doc. 1 at 9; Doc. 2 at 55–57). Petitioner argues that by making this concession, defense counsel conceded guilt (at least to lesser offenses and possibly the offense charged) (*id.*). Petitioner further states that defense counsel did not consult with him regarding this strategy or obtain his consent to it (*id.*). Petitioner contends that but for counsel's ineffectiveness, the result of the proceeding would have been different (*id.*). In Ground Seven, Petitioner contends defense counsel was ineffective for advising him to reject a plea offer from the State of a fifteen-year prison term (Doc. 1 at 9–10; Doc. 2 at 57–59). Petitioner states defense counsel advised him that he (counsel) had already won the case in the media, and Petitioner was in a "no lose" trial situation (*id.*). Petitioner asserts there is a reasonable probability that he would have accepted the plea agreement absent defense counsel's advice (Doc. 2 at 59).

Petitioner raised Grounds Six and Seven as Grounds (k) and (d), respectively, in his Rule 3.850 motion (Doc. 22, L at 97, 100–01). The trial court denied the claims on the merits (Doc. 22, Ex. O at 135). Petitioner filed a brief on appeal of the court's denial of the motion, but he failed to address these issues in his brief (*see* Doc. 22, Ex. V). This constituted an abandonment of those issues on appeal. *See* <u>Sweet</u>, 810 So. 2d at 870; <u>Reed</u>, 875 So. 2d 415; <u>Johnson</u>, 769 So. 2d at 1005–06; *see also* <u>Sharp</u>, 2009 WL 981594, at **13–14; <u>Durain</u>, 2008 WL 4888989, at *9; <u>Williams</u>, 2007 WL 2330794, at **1–2; <u>Walker</u>, 2007 WL 1747181, at *4. Therefore, as with

Ground Three, *supra*, Grounds Six and Seven were not properly exhausted and are considered procedurally defaulted.[11]

Petitioner has failed to show cause and prejudice to excuse the procedural default. Additionally, he has failed to establish entitlement to federal review through the fundamental miscarriage of justice gateway, as discussed *supra*. Therefore, Petitioner is not entitled to federal habeas relief on either of these claims. *See* Alexander, 163 F.3d at 908; Lambert, 134 F.3d at 515; Miller, 431 F.3d at 245; Jones, 163 F.3d at 299.

> H.    Ground Eight: "Defense counsel rendered ineffective assistance of counsel by failing to ensure that the discussion concerning the motion for judgment of acquittal was properly recorded by the court reporter; alternatively, defense counsel was ineffective for failing to properly move for a judgment of acquittal and adequately set forth the grounds for the motion."

Petitioner contends his trial counsel was ineffective for failing to ensure that the discussion concerning the motion for judgment of acquittal was properly recorded by the court reporter (Doc. 1 at 10; Doc. 2 at 59–60). Petitioner states that after the State rested its case, the trial judge called counsel to the bench for a sidebar conference, but the conference was not recorded (Doc. 2 at 59–60). Petitioner states that although the conference was not recorded, the record establishes that defense counsel made a motion for judgment of acquittal during the conference, which was denied (*id.* at 60). Petitioner states that on direct appeal, he argued that the trial court erred by denying the motion for judgment of acquittal, and the State responded that the issue (or portions of it) had not been preserved because the argument was not raised in the trial court (*id.*). The appellate court affirmed without explaining its reasoning (*id.*). Petitioner states that under Florida law, when it is not clear whether a court denied a claim on the merits or because the claim was not preserved, it must be assumed that the claim was denied because it was not preserved (*id.*) (citing Bruno v. State, 807 So. 2d 55, 66 (Fla. 2002)). Petitioner claims he was prejudiced by defense counsel's failure to ensure that the sidebar conference was recorded because if the conference had been recorded, there would have been no doubt that all claims concerning the motion for judgment of acquittal were

---

[11] As previously noted, Respondent did not expressly waived the exhaustion requirement in this case (*see* Doc. 31).

properly preserved, and the state appellate court would not have affirmed on the basis of legal insufficiency (Doc. 1 at 10; Doc. 2 at 60).

Petitioner alternatively argues that defense counsel was ineffective for failing to properly move for judgment of acquittal and adequately setting forth specific grounds for the motion (Doc. 1 at 10; Doc. 2 at 60–61).  Petitioner states if the basis for defense counsel's motion for judgment of acquittal as stated at the conclusion of the case was the only basis stated by counsel during the sidebar conference, then defense counsel was ineffective for failing to properly argue that the State's case was based upon wholly circumstantial evidence, and the State failed to produce competent substantial evidence inconsistent with Petitioner's theory of events (Doc. 2 at 61).  Petitioner asserts that but for counsel's errors, he would have either won his motion for judgment of acquittal at trial or succeeded on appeal (*id.*).

Respondent states Petitioner presented both of these sub-claims to the state court as Grounds (f) and (g) in his Rule 3.850 motion (*see* Doc. 20 at 66), and the court held an evidentiary hearing on the claims (*id.*).  Respondent argues that although the trial court ruled on the aspect of Petitioner's claim asserting that defense counsel failed to ensure a record for appeal, the court did not rule on the claim that defense counsel failed to argue the "circumstantial evidence rule" (*id.* at 67–71).  Respondent contends that Petitioner raised both aspects of his claim on appeal of the denial of his Rule 3.850 motion, but Petitioner's failure to obtain a ruling below on his claim concerning counsel's failure to argue the "circumstantial evidence rule" renders that claim unexhausted because, with no ruling available for review, it was not presented to the appellate court in a procedural context in which its merits would have been considered (*id.* at 71).  Respondent further contends that even if the exhaustion requirement were satisfied as to this claim, Petitioner's claim is without merit (*id.* at 72–73).

In his reply brief, Petitioner contends that in the context of a post-conviction motion, raising an issue in the motion and obtaining a ruling denying the motion is sufficient to exhaust the claim in state court (Doc. 28 at 13).

The undersigned concludes that Petitioner exhausted both aspects of his ineffective assistance of counsel claim in the state courts.  Petitioner raised his claims as Grounds (f) and (g)

in his Rule 3.850 motion (*see* Doc. 22, L at 98–99), and he argued both aspects of his claim as Issue #3 in his brief on appeal of the trial court's denial of his Rule 3.850 motion (*see* Doc. 22, Ex. V). This was sufficient to properly present his claims to the state courts. Therefore, the undersigned will address whether Petitioner satisfied the AEDPA standard for federal habeas relief on his claims.

1.      Clearly Established Supreme Court Law

The clearly established Supreme Court law governing claims of ineffective assistance of counsel is the two pronged <u>Strickland</u> standard described *supra*.

2       Federal Review of State Court Decision

As previously noted, Petitioner raised both aspects of his ineffective assistance of counsel claim as Grounds (f) and (g) in his Rule 3.850 motion (Doc. 22, Ex. L at 98–99). The state court denied Grounds (f) and (g) (referred to as grounds six and seven), and the decision was affirmed by the First DCA (Doc. 22, Ex. W). While the affirmance was a per curiam opinion without reasoning, this court presumes that the First DCA's decision affirms the reasoning, as well as the judgment, of the circuit court. "'Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.'" <u>Sweet</u>, 467 F.3d at 1316–17; *see also* <u>Harmon</u>, 894 F.2d at 1273.

In the trial court's written opinion denying Petitioner's claims, the state court identified the <u>Strickland</u> standard as the controlling legal standard for analyzing claims of ineffective assistance of counsel (Doc. 22, Ex. S at 159). Because the state court correctly identified <u>Strickland</u> as the governing precedent, Petitioner is entitled to federal habeas relief only if he demonstrates that the state court decision was based upon an unreasonable determination of the facts or that the state court decision was an unreasonable application of <u>Strickland</u>.

The state court found as fact that defense counsel made a motion for judgment of acquittal in open court after the jury retired to consider its verdict, and there was no evidence that Petitioner was not present when the motion was made (*id.* at 158). The court additionally determined that the motion was timely, and defense counsel stated the grounds for the motion, that is, there was no evidence of a depraved mind which would support a second degree murder conviction (*id.*). The court concluded that Petitioner's contentions that defense counsel failed to properly preserve the

insufficiency of the evidence issue for appeal and failed to properly move for judgment of acquittal were without merit (*id.*).

Initially, Petitioner has failed to show that the state court's adjudication of his claim was based upon an unreasonable determination of the facts. The record shows that defense counsel made a motion for judgment of acquittal on the record and stated as grounds for the motion that there was no evidence of a depraved mind which would support a conviction for second degree murder (*see* Doc. 22, Ex. B at 384–85). Petitioner has failed to rebut the court's factual findings with clear and convincing evidence; therefore, the findings are presumed correct.

Additionally, the state court's determinations that defense counsel's motion was timely, and defense counsel properly preserved the insufficiency of the evidence issue for appeal are entitled to deference. Determinations of whether a motion challenging the sufficiency of the evidence is timely and sufficient to properly preserve the issue for appellate review are solely within the province of the Florida courts. "[S]tate courts are the ultimate expositors of state law," and federal courts must therefore abide by their rulings on matters of state law. Mullaney v. Wilbur, 421 U.S. 684, 691, 95 S.Ct. 1881, 1886, 44 L.Ed.2d 508 (1975) (citations and footnote omitted); Carrizales v. Wainwright, 699 F.2d 1053, 1055 (11th Cir.1983). In light of the state court's determinations, Petitioner failed to satisfy the performance prong of the Strickland standard.

Petitioner also failed to demonstrate a reasonable probability that the outcome of either his trial or appeal would have been different if defense counsel had included additional argument in his motion, namely, that the evidence was wholly circumstantial, and the State failed to present competent substantial evidence inconsistent with Petitioner's excusable homicide defense. As previously discussed, in Florida, when the state relies upon purely circumstantial evidence to convict an accused, the evidence not only must be consistent with the defendant's guilt but also inconsistent with any reasonable hypothesis of innocence. Davis, 703 So. 2d at 1059. Even in a purely circumstantial evidence case, the State is not required to rebut conclusively every possible variation of events that could be inferred from the evidence, but only to introduce competent evidence that is inconsistent with the defense's version or theory of events. Law, 559 So. 2d at 188–89. Upon motion for judgment of acquittal, the trial court must review the evidence in the light most favorable

to the State and determine whether the State has presented competent evidence "from which the jury could infer guilt to the exclusion of all other inferences." *Id.* at 188.

Petitioner's theory of defense was that he accidentally killed Mr. Pacheco as a result of sudden combat and, therefore, the killing was lawful and excusable. Florida Statutes section 782.03 defines excusable homicide as follows:

> Homicide is excusable when committed by accident and misfortune in doing any lawful act by lawful means with usual ordinary caution, and without any unlawful intent, or by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, without any dangerous weapon being used and not done in a cruel or unusual manner.

Fla. Stat. § 782.03 (2000). A killing is not justifiable or excusable if the defendant brought about the necessity therefor through his own wrongful act or without being reasonably free from fault in provoking the difficulty in which the killing occurred. Bowman v. State, 152 So. 739 (Fla. 1934).

> Where the issue of who was the aggressor and the causation of the killing in the course of a mutual combat is presented for determination on conflicting evidence, it is for the jury to decide whether or not under the circumstances shown in evidence the homicide was justifiable or excusable under the law relating to the right of self defense, and the jury's finding on that score will not be disturbed by an appellate court.

*Id.*

In the instant case, Petitioner testified that the fight between Mr. Pacheco and him started when he awoke from a drunken stupor and found Mr. Pacheco on top of him; thereby suggesting that Mr. Pacheco was the aggressor and creating an alleged necessity for beating Mr. Pacheco unconscious. However, the State presented evidence inconsistent with the theory that Mr. Pacheco was the aggressor, including Jessica Lichaczewski's testimony that Mr. Pacheco never became physically combative when he drank, and the medical examiner's testimony that (1) the cause of Mr. Pacheco's death was homicidal violence including blunt force head trauma and drowning, (2) Mr. Pacheco's anal rectal region had a surface tear of the skin and mucosa, accompanied by some blue discoloration or bruising and some blue discoloration or bruising on the right and left sides of his anal canal, (3) Mr. Pacheco had numerous other injuries to his face, head, shoulders, arms, chest, ribs, and hip, and (4) the knuckle areas of Mr. Pacheco's hands did not show any signs of injury.

Additionally, the jury heard evidence inconsistent with Petitioner's theory that Mr. Pacheco's death was accidental, including Petitioner's testimony that he purposely beat Mr. Pacheco unconscious, and Investigator Corley's testimony that he observed blood from the parking lot, through the park, and leading to the water where the victim's body was floating face down out from the seawall, and he found wet clothing in the trunk of Petitioner's car.  Because the State presented evidence of Petitioner's guilt inconsistent with Petitioner's theory of excusable homicide, it was the jury's role to decide whether the homicide was excusable.  Therefore, Petitioner failed to demonstrate a reasonable probability of success, either in the trial court or on appeal, if defense counsel had argued that the State failed to present competent substantial evidence inconsistent with his excusable homicide defense.  Moreover, to the extent Petitioner argues defense counsel should have included more specific argument regarding the lack of evidence of depraved mind, Petitioner has failed to show a reasonable probability of a different result at trial or on appeal, since there was sufficient evidence of depraved mind to submit the case to the jury, as discussed in Ground One *supra*.

In light of the foregoing discussion, Petitioner failed to demonstrate that the state court's denial of his ineffective assistance of counsel claim was based upon an unreasonable determination of the facts or was contrary to or an unreasonable application of <u>Strickland</u>.  Therefore, he is not entitled to federal habeas relief on Ground Eight.

I.  <u>Ground Nine: "The state court erroneously sentenced Petitioner Ross to a mandatory life sentence pursuant to the prison Releasee Reoffender Act because the State should have been required to notify the victim's family of the possible sentence and thereafter determine whether the victim's family wanted the State to pursue a releasee reoffender sentence.  Alternatively, defense counsel was ineffective for failing to contact the victim's family to determine whether the victim's family wanted the State to pursue a releasee reoffender sentence."</u>

Petitioner asserts two sub-claims in Ground Nine.  First, he contends the prosecution was statutorily required to consult the victim's family prior to pursuing a prison releasee reoffender sentence, pursuant to Florida Statutes section 775.082(9)(a)(1), but the prosecutor failed to do so in his case (Doc. 1 at 9–10; Doc. 2 at 61–65).  Petitioner contends the prosecutor abused her discretion by failing to fulfill this statutory requirement, which amounts to a violation of his due process rights set forth in the Fourteenth Amendment (Doc. 1 at 11; Doc. 2 at 62–64; Doc. 28 at 15–16).  Second,

Petitioner contends defense counsel rendered ineffective assistance by failing to contact the victim's family to determine whether the family wanted the State to pursue a releasee reoffender sentence (Doc. 1 at 9–10; Doc. 2 at 64–65).

Respondent contends that although it appears that Petitioner exhausted the part of his claim concerning defense counsel's failure to contact the victim's family by asserting it as Ground (p) in his Rule 3.850 motion, Petitioner did not exhaust the due process aspect of his claim and thus procedurally defaulted it (Doc. 20 at 74, 76).

In his reply, Petitioner asserts that the due process claim is "inextricably intertwined" with the ineffective assistance of counsel claim (Doc. 28 at 14–15). Therefore, applying the "liberal construction doctrine" afforded to pro se pleadings, he fairly presented and exhausted this claim in his Rule 3.850 motion (*id.* at 15).

The record shows that as Petitioner raised the following issue as Ground (p) in his Rule 3.850 motion:

> (p) Counsel failed to contact the victim's family in this case to see if they were amenable to waiving the dictates of the Prison Release Reoffender Statute. The law, in effect at the time of the offense in this case, allows the victims [sic] family to waive use of the PRR enhancement.
>
> Had Counsel contacted and discussed the facts of the case and Ross' expression of remorse as to his part in the case to the victim's family, there is a reasonable probability that the family would have waived the dictates of the PRR, and Ross would have received a guideline sentence.

(Doc. 22, L at 103).

The trial court denied the claim on the merits as follows:

> Finally, ground sixteen alleges that counsel was ineffective for failing to contact the victim's families to request a waiver Prison [sic] Releasee Reoffender designation. However, as the State was seeking such designation a waiver by the victim's family would have been inconsequential. This claim should be denied.

(Doc. 22, Ex. O at 136).

Initially, the undersigned concludes that Petitioner did not fairly present the due process aspect of his claim to the state courts. He framed his federal claim solely as one of ineffective assistance of counsel and did not indicate any due process basis for his claim. Therefore, the due

process aspect of Ground Nine is unexhausted. Additionally, with regard to the ineffective assistance of counsel aspect of his claim, Petitioner did not raise this claim on appeal of the trial court's denial of his Rule 3.850 motion (*see* Doc. 22, Ex. V). As with Grounds Three, Six, and Seven, discussed *supra*, claims that are not briefed on appeal of the denial of a Rule 3.850 motion following an evidentiary hearing are deemed abandoned on appellate review. *See* Sweet, 810 So. 2d at 870; Reed, 875 So. 2d 415; Johnson, 769 So. 2d at 1005–06; *see also* Sharp, 2009 WL 981594, at **13—14; Durain, 2008 WL 4888989, at *9; Williams, 2007 WL 2330794, at **1–2; Walker, 2007 WL 1747181, at *4. Therefore, neither aspect of Ground Nine was properly exhausted, and both are considered procedurally defaulted.

Petitioner has failed to show cause and prejudice to excuse the procedural default. Additionally, he has failed to establish entitlement to federal review through the fundamental miscarriage of justice gateway, as discussed *supra*. Therefore, Petitioner is not entitled to federal habeas relief on either of the claims raised in Ground Nine. *See* Alexander, 163 F.3d at 908; Lambert, 134 F.3d at 515; Miller, 431 F.3d at 245; Jones, 163 F.3d at 299.

> J.    Ground Ten:  "The finding that Petitioner Ross was a prison releasee reoffender violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and the Sixth Amendment right to a trial by jury."

Petitioner contends his sentence was increased based upon facts that were not charged in the information or proven to a jury beyond a reasonable doubt, in violation of his Sixth Amendment rights as announced in Apprendi v. New Jersey, 530 U.S. 466 (2000) (Doc. 1 at 11–12; Doc. 2 at 66–76). Petitioner states he was sentenced as a prison releasee reoffender (PRR) and given a minimum mandatory sentence of life imprisonment based upon the fact that he committed the instant offense within three years after being released from prison; however, this fact was not charged in the information or found by the jury beyond a reasonable doubt (Doc. 2 at 66–76). Petitioner acknowledges that current Supreme Court precedent creates an exception to the rule in Apprendi for judicial fact finding that relates to recidivism, *see* Almendarez-Torres v. United States, 523 U.S. 224 (1997), but he contends there is no justification for a recidivism exception (*id.*).

Respondent contends Petitioner failed to exhaust this claim in the state courts (Doc. 20 at 83–84). Respondent states Petitioner presented an Apprendi argument for the first time in his brief

on appeal from the denial of his Rule 3.800(a) motion (*id.* at 83); however, Petitioner did not present an Apprendi argument to the lower court in his Rule 3.800(a) motion. Therefore, pursuant to Florida law, the Apprendi argument was not cognizable on appeal of the lower court's denial of the motion (*id.*). Thus, Petitioner's Apprendi-based claim has never been presented to a state court in a procedural context in which its merits were considered (*id.* at 84). Moreover, the claim is now procedurally barred from state court review (*id.*). Alternatively, Respondent argues the claim is without merit (*id.* at 84–86).

Regardless of whether Petitioner exhausted his claim, his Sixth Amendment claim is without merit. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). In Almendarez-Torres, 523 U.S. at 243, the Supreme Court held that a federal sentencing provision which increases the maximum sentence for an alien who illegally enters the United States after being deported does not set out a separate offense, but rather is a penalty provision or sentencing factor for the offense of illegal reentry. The Court in that case noted that "recidivism . . . is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence." *Id.* In Apprendi, the Supreme Court declined to overrule Almendarez-Torres, holding that it constituted a "narrow exception" to the rule that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490. The court concluded that its newly-announced rule applies to any fact "other than the fact of a prior conviction." *Id.* Accordingly, federal courts have repeatedly held that the holding of Almendarez-Torres survived Apprendi. *See, e.g.*, United States v. Marseille, 377 F.3d 1249 (11th Cir. 2004) (defendant not entitled to have a jury determine whether he has the requisite predicate convictions for an habitual offender sentence); United States v. Acevedo, 285 F.3d 1010 (11th Cir. 2002); United States v. Anglin, 284 F.3d 407, 408 (2d Cir. 2002).[12]

---

[12] The undersigned notes that the Florida courts have specifically rejected the claim that the Prison Release Reoffender Act is unconstitutional in light of the Supreme Court's decision in Apprendi. *See* Gudinas v. State, 879 So. 2d 616 (Fla. 2004) (noting that Apprendi exempted prior convictions from facts that must be submitted to a jury because they increase the penalty for a crime and that Florida's Prison Releasee Reoffender Act is unaffected by Apprendi); Marshall v. State, 789 So. 2d 969 (Fla. 2001); Stabile v. State, 790 So. 2d 1235, 1238 (Fla. 5th DCA 2001) ("Apprendi

In the instant case, the fact that Petitioner committed the instant offense within three years after being released from prison is analogous to the fact of a prior conviction because it demonstrates Petitioner's recidivism. Therefore, the sentencing court's imposing a PRR sentence did not violate Apprendi. Accordingly, Petitioner is not entitled to federal habeas relief on this claim.

    K.     Ground Eleven: "The cumulative effect of defense counsel's errors deprived Petitioner Ross of a fair trial."

Petitioner contends all of the errors committed by defense counsel, considered either individually or together, resulted in his being denied a fair trial (Doc. 1 at 12; Doc. 2 at 76).

Respondent contends Petitioner failed to exhaust this claim, and it is now procedurally defaulted (Doc. 20 at 87). Respondent states that Petitioner presented his claim as Ground (q) in his Rule 3.850 motion; however, the trial court failed to address it (Doc. 22, Exs. O, S). Respondent contends that under Florida law, Petitioner should have obtained a ruling on his claim, and by failing to do so, he failed to properly preserve the issue for appellate review (*id.*).

In his reply, Petitioner contends he properly exhausted the claim by raising it in his Rule 3.850 motion (Doc. 28 at 16).

The undersigned concludes that Petitioner's "cumulative effect" claim was not exhausted. Where, as here, Petitioner's Rule 3.850 motion was denied following an evidentiary hearing, notwithstanding that the hearing was limited in scope to only seven of his seventeen claims, he was required to file an appellate brief. *See* Fla. R. App. P. 9.1419b)(3). Petitioner filed a brief (*see* Doc. 22, Ex. V), and his failure to address his "cumulative effect" claim constituted an abandonment of that issue on appeal. *See* Sweet, 810 So. 2d at 870; Reed, 875 So. 2d 415; Johnson, 769 So. 2d at 1005–06; *see also* Sharp, 2009 WL 981594, at **13–14; Durain, 2008 WL 4888989, at *9; Williams, 2007 WL 2330794, at **1–2; Walker, 2007 WL 1747181, at *4. Therefore, as with Grounds Three, Six, Seven, and Nine, *supra*, this claim is unexhausted and procedurally barred. Petitioner has failed to overcome the procedural bar by satisfying the "cause and prejudice" or

---

is inapplicable to the Prison Releasee Reoffender Act, because the Act merely limits the court's discretion in sentencing. It does not increase the penalty beyond the statutory maximum."). Similarly, the Florida courts have held that for the purpose of applying Apprendi and Blakely v. Washington, 542 U.S. 296 (2004), the date of a defendant's release from prison under the prison releasee reoffender statute is analogous to the fact of a prior conviction under other recidivist statutes, including the habitual felony offender statute. *See* Gurley v. State, 906 So. 2d 1264 (Fla. 4th DCA 2005).

fundamental miscarriage of justice standard. Therefore, he is not entitled to federal review of this claim.

Setting aside for a moment the procedural bar to this claim, the court notes that the Supreme Court has not recognized the cumulative error doctrine in the context of an ineffective assistance of counsel claim.[13] Although the Eleventh Circuit has noted, on direct appeal of a federal conviction, that the cumulative effect of several errors that are harmless by themselves could so prejudice the defendant's right to a fair trial that a new trial may be necessary, *see* United States v. Ramirez, 426 F.3d 1344, 1353 (11th Cir. 2005) ("[T]he 'cumulative effect' of multiple errors may so prejudice a defendant's right to a fair trial that a new trial is required, even if the errors considered individually are non-reversible.") (quoting United States v. Thomas, 62 F.3d 1332, 1343 (11th Cir.1995)), United State v. Adams, 74 F.3d 1093, 1099–1100 (11th Cir. 1996) (citing United States v. Preciado-Cordobas, 981 F.2d 1206, 1215 n.8 (11th Cir. 1993)), the Eleventh Circuit has never expressly recognized a freestanding "cumulative effect" claim, based upon the assertion that alleged errors of the trial court, defense counsel, or the State, or a combination thereof, rendered the trial fundamentally unfair even though such errors were individually harmless or non-prejudicial, as cognizable under § 2254. *See, e.g.,* Conklin v. Schofield, 366 F.3d 1191, 1210 (11th Cir. 2004) (applying pre-AEDPA standard of review and denying claim that trial court errors and conduct of trial counsel combined to rob petitioner of fair trial and sentencing, but not relying upon Supreme Court precedent for its decision); Sims v. Singletary, 155 F.3d 1297 (11th Cir. 1998) (applying pre-AEDPA standard of review and holding that district court erred in finding that cumulative guilt stage errors prejudiced petitioner during penalty phase); Cargill v. Turpin, 120 F.3d 1366, 1386 (11th Cir. 1997) (applying pre-AEDPA standard of review and declining petitioner's invitation to entertain "cumulative error" claim because petitioner's trial was not fundamentally unfair); Dobbs v. Kemp,

---

[13] The Eleventh Circuit recently noted "the absence of Supreme Court precedent applying cumulative error doctrine to claims of ineffective assistance of counsel." Forrest v. Fla. Dep't of Corr., 2009 WL 2568185, at *4 (11th Cir. Aug. 21, 2009) (unpublished). The court cautioned that the Supreme Court has held that "there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *Id.* at 5 (quoting United States v. Cronic, 466 U.S. 648, 659 n.26, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984)).

790 F.2d 1400, 1505 (11th Cir. 1986) (applying pre-AEDPA standard of review and denying petitioner's claim that improper prosecutorial argument and evidentiary errors rendered trial fundamentally unfair and citing <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1973)); <u>Bronstein v. Wainwright</u>, 646 F.2d 1048, 1056 (5th Cir. 1981) (same).[14]

In any event, cumulative error analysis should evaluate only matters determined to be in error, not the cumulative effect of non-errors. *See* <u>United States v. Barshov</u>, 733 F.2d 842, 852 (11th Cir. 1984) ("Without harmful errors, there can be no cumulative effect compelling reversal."); <u>Mullen v. Blackburn</u>, 808 F.2d 1143, 1147 (5th Cir. 1987) ("Mullen cites no authority in support of his assertion, which, if adopted, would encourage habeas petitioners to multiply claims endlessly in the hope that, by advancing a sufficient number of claims, they could obtain relief even if none of these had any merit. We receive enough meritless habeas claims as it is; we decline to adopt a rule that would have the effect of soliciting more and has nothing else to recommend it. Twenty times zero equals zero."); *see also* <u>United States v. Hall</u>, 455 F.3d 508, 520 (5th Cir. 2006); <u>Mancuso v. Olivarez</u>, 292 F.3d 939, 957 (9th Cir. 2002) (where there is no single constitutional error, nothing can accumulate to the level of a constitutional violation); <u>United States v. Hardy</u>, 224 F.3d 752, 757 (8th Cir.2000); <u>Angelone</u>, *supra*; <u>Moore v. Reynolds</u>, 153 F.3d 1086, 1113 (10th Cir.1998); <u>United States v. Rivera</u>, 900 F.2d 1462, 1471 (10th Cir. 1990) ("[A] cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors."); <u>United States v. Conteh</u>, 234 Fed. Appx. 374, 2007 WL 1229043 (6th Cir. 2007). Thus, Petitioner must show error with respect to at least two of his individual claims.

---

[14] The law of the other circuit courts of appeals is mixed on the issue of whether a claim of "cumulative effect" or "cumulative error" is cognizable on federal habeas. The Fourth, Sixth and Eighth Circuits do not recognize cumulative error claims on federal habeas. *See* <u>Williams v. Anderson</u>, 460 F.3d 789, 816 (6th Cir. 2006) (claims of cumulative error are not cognizable on federal habeas because the Supreme Court has not spoken on this issue); <u>Fisher v. Angelone</u>, 163 F.3d 835, 852–53 (4th Cir. 1998) (ineffective assistance of counsel claims, like claims of trial court error, must be reviewed individually, rather than collectively; <u>Wainwright v. Lockhart</u>, 80 F.3d 1226, 1233 (8th Cir. 1996) ("Neither cumulative effect of trial errors nor cumulative effect of attorney errors are grounds for habeas relief."). The Ninth Circuit recognizes cumulative error claims and expressly recognized <u>Chambers v. Mississippi</u>, 410 U.S. 284 (1973) as the clearly established federal law governing such claims. *See* <u>Parle v. Runnels</u>, 505 F.3d 922, 928–29 (9th Cir. 2007). The Tenth Circuit recognizes cumulative error claims and recognized <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993) as the clearly established federal law on this issue. *See* <u>Darks v. Mullin</u>, 327 F.3d 1001, 1018 (10th Cir. 2003). The Second and Seventh Circuits recognize cumulative effect analysis of individual claims of ineffective assistance of counsel in applying the prejudice prong of <u>Strickland</u>. *See* <u>Williams v. Washington</u>, 59 F.3d 673, 682–84 (7th Cir. 1995); <u>Rodriguez v. Hoke</u>, 928 F.2d 534 (2d Cir. 1991).

In the instant case, Petitioner asserts, "All of the errors committed by counsel . . . considered either individually or together, resulted in Petitioner Ross being denied a fair trial." (Doc. 1 at 12; Doc. 2 at 76). As previously discussed, none of the alleged errors of trial counsel that this court substantively reviewed, considered alone, approach the threshold standard of ineffective assistance of counsel. Taken together, their cumulative effect also falls far short of depriving Petitioner of effective assistance of counsel or a fundamentally unfair trial. Furthermore, the remaining claims were procedurally barred. Therefore, Petitioner is not entitled to federal habeas relief on this claim. *See* Bronstein v. Wainwright, 646 F.2d 1048 (11th Cir. 1981) ("[A] state trial must be so 'fundamentally unfair' as to amount to a denial of due process before federal habeas relief can be appropriately applied.") (internal quotation and citation omitted)); *see also* Walls v. McNeil, No. 3:06cv237/MCR, 2009 WL 3187066, at **30–31 (N.D. Fla. Sept. 30, 2009) (unpublished) (same).

## VI.    CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That the petition for writ of habeas corpus (Doc. 1) be **DENIED**.

2.    That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 14th day of April 2010.


/s/ Elizabeth M. Timothy
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).